CUSHMAN & WAKEFIELD OF ILLINOIS, INC., Plaintiff-Counterdefendant-Appellee and Cross-Appellant, *v.* NORTHBROOK 500 LIMITED PARTNERSHIP *et al.*, Defendants-Counterplaintiffs-Appellants and Cross-Appellees.

First District (4th Division)   No. 81—2900

Opinion filed February 17, 1983.

Theodore A. Shapero and Mark L. Shapiro, both of Rudnick & Wolfe, of Chicago, for appellants.

Harvey J. Barnett, of Barnett and Beigel, Ltd., of Chicago, for appellee.

JUSTICE JOHNSON delivered the opinion of the court:

Plaintiff, Cushman & Wakefield of Illinois, Inc., brought an action against defendants, Northbrook 500 Limited Partnership, Richard Stein and James Otis, to recover leasing commissions claimed to be

due under a renting agency agreement. Defendants counterclaimed for damages from plaintiff for overspending on tenant improvements on the various leases negotiated by plaintiff's assignor. A jury awarded plaintiff $130,807.12 in leasing commissions. The trial court directed a verdict against defendants' counterclaim and denied plaintiff's claim for prejudgment interest on the commissions. Defendants appeal the jury's finding for plaintiff and the court's directed verdict dismissing their counterclaim. Plaintiff appeals the court's denial of prejudgment interest on the commissions.

The issues raised on appeal are (1) whether plaintiff was required to plead and prove that its individual brokers, officers and management personnel, as well as those of its assignor, were all licensed real estate brokers during the time of the rental agency agreement; (2) whether plaintiff proved that it was entitled to the rental commissions awarded by the jury, including the commission for the lease held by Combined Insurance Company of America; (3) whether the trial court properly directed a verdict against defendants on their counterclaim for damages; and (4) whether plaintiff is entitled to prejudgment interest on the commissions owed by defendants.

This case involves several parties. For the sake of clarity, each party and his relevant relationship to this litigation are outlined as follows:

(1) Cushman & Wakefield, Inc., a New York corporation (C&W), made the original renting agency agreement (Agreement) with defendants. C&W later assigned its interest under the Agreement to plaintiff.

(2) Cushman & Wakefield of Illinois, Inc., an Illinois corporation, is the plaintiff and the assignee of C&W, the New York corporation.

(3) Northbrook 500 Limited Partnership is a defendant and developer of the Northbrook 500 building.

(4) Richard A. Stein and James Otis are also defendants and each owns a partnership interest in the Northbrook 500 Limited Partnership.

(5) John Buck and Wesley Irvine were vice-presidents of C&W at the time of formation of the original Agreement between C&W and Northbrook 500 Limited Partnership. Buck and Irvine each owned a one-sixth interest in the Northbrook 500 project, and they also served as renting managers on behalf of C&W during the term of the Agreement. They testified on be-

half of plaintiff, Cushman & Wakefield of Illinois, Inc., but were not, themselves, parties to the litigation.

In 1975, Richard Stein and James Otis undertook the development of an office building known as the Northbrook 500, in Northbrook, Illinois. John Buck and Wesley Irvine, vice-presidents of C&W, a large real estate brokerage company headquartered in New York, were contacted. An agreement was reached whereby Stein, Otis, Buck and Irvine would become partners in the project. Stein and Otis each owned a one-third interest and Buck and Irvine each owned a one-sixth interest in the project. The parties agreed that C&W would be the exclusive leasing agent for the building. Buck and Irvine, vice-presidents of C&W as well as partners in the project, were to be rental managers under the renting Agreement. C&W was to receive certain stated commissions. The Agreement was reconfirmed in August 1976, retroactive to January 1, 1976, when two additional individuals joined and the partnership was changed to a limited partnership.

The Agreement provided in pertinent part as follows:

"THIS RENTING AGENCY AGREEMENT made this 23rd day of August, 1976, between NORTHBROOK 500 LIMITED PARTNERSHIP, an Illinois limited partnership, having an office c/o Richard A. Stein, 208 South LaSalle Street, Chicago, Illinois, 60604, (hereinafter referred to as 'Owner'), and CUSHMAN & WAKEFIELD, INC., a New York corporation, with local offices at 233 South Wacker Drive, Room 5220, Chicago, Illinois 60606, (hereinafter referred to as 'Agent').

1. Owner hereby designates Agent and Agent agrees to serve, as the exclusive Renting Agent in connection with the leasing of the office and commercial space in the Premises for a term of three (3) years commencing September 1, 1976 and ending August 31, 1979, unless earlier terminated in accordance with the provisions hereof.

2. Agent shall use its best efforts in leasing and disposing of office and commercial space in the Premises and in keeping the Premises rented to desirable tenants and, to this end, Agent shall list space in the Premises with its brokers and salesmen and is hereby authorized on behalf of Owner to enlist the services of other real estate brokers. Agent shall, at all times, perform its leasing services hereunder diligently and in a first class manner designed to best protect and promote the leasing of the Premises.

\* \* \*

5. (a) Owner Shall pay Agent on each lease executed and de-

livered during the term of this Agreement a commission equal to 7% of the 'Base Lease Rent', as hereinafter defined, for the first year of such lease, and 2% of the Base Lease Rent, for all years thereafter. On any lease which is procured from an outside broker, a commission of 7% of the Base Lease Rent for the first year and 2% of the Base Lease Rent for the remainder of the term shall be paid to said outside broker, and, in addition, Owner shall pay to Agent a commission ('Override') of 2.8% of the Base Lease Rent for the first year of the lease and .8% of the Base Lease Rent for the remainder of the term of such lease. As used herein, 'Base Lease Rent' for the first year of a lease shall mean the annual Base Rent as set forth in the Lease executed for space in the Premises. The Base Lease Rent for the remainder of the term of a lease shall mean the total Base Rent for each of the remaining years in the initial fixed lease term of a lease as set forth therein, excluding therefrom any period with respect to which a tenant has a right of lease cancellation. For leases which provide for step-ups, or step-downs of Base Rent during the initial fixed term, Base Lease Rent shall be the sum of the product of each stated annual Base Rent times the number of years such stated annual Base Rent is to be in effect. There shall be excluded from Base Lease Rent rental abatements or 'take-over' payments with respect to space formerly occupied by the tenant.

(b) If any lease on which a commission is payable hereunder is re-negotiated prior to the expiration of the original initial fixed term thereof, the commission payable to Agent shall not be affected by such re-negotiation, provided, however, that if the Base Lease Rent under such re-negotiated lease is increased based upon additional space being leased to the tenant thereunder, then Agent shall be entitled to receive a commission equal to 2% of such increase for the remainder of the initial lease term. Said commission shall be payable as hereinafter provided;

(c) In the event a tenant shall exercise an option or right contained in a lease made during the term of this Agreement for a renewal or extension of the Lease, or to lease additional space, Owner shall pay to Agent a commission equal to 2% of the Base Lease Rent payable by tenant during such renewal or extension period; or on account of such additional space;

(d) If any lease with respect to which a commission hereunder is payable contains a cancellation right and if the tenant's right

to cancel expires without being exercised, then Agent shall be entitled to such additional commission on such Lease as it would have earned if the Base Lease Rent for the portion of the lease term with respect to which tenant had a right of lease cancellation had been taken into account when its commission on such lease was originally calculated."

In June 1976, a revised budget for tenant improvement and a standard "work letter" were approved by the partnership. The work letter defined which tenant improvements would be provided by the partnership as part of the leasing agreement. The tenant improvement budget was $400,000, or approximately $4.12 per square foot of rental space. It appears that a date 18 months after the opening of the building was set as the goal for completing the leasing of the building. Under the Agreement, C&W was the exclusive renting agent for the building.

Sometime in 1977, Combined Insurance Company of America contacted either Otis or Stein regarding the negotiation of a lease. C&W, the leasing agent, was not involved in those negotiations. A lease was subsequently signed by Combined Insurance for rental of one-third of the available space in the building. The lease contained a paragraph naming C&W as the real estate broker responsible for that lease. However, at trial, both Otis and Stein gave unrebutted testimony that C&W had nothing to do with negotiating the Combined Insurance lease.

In December 1977, the partnership became aware that the project was over the $400,000 budget for tenant improvements. In February 1978, Stein, a one-third interest owner, purchased the total one-third partnership interests of Buck and Irvine, and the exclusive Agreement with C&W was severed shortly thereafter. A document entitled Agreement Modifying Renting Agency Agreement (Modification) was signed on February 28, 1978. This agreement modified the original Agreement. Stein testified that he never saw the Modification and that Buck signed on behalf of the partnership. The Modification provided in pertinent part as follows:

"AGREEMENT MODIFYING RENTING AGENCY AGREEMENT

THIS AGREEMENT is made this 28th day of February, 1978, between NORTHBROOK 500 LIMITED PARTNERSHIP, an Illinois limited partnership ('Owner', acting by RICHARD A. STEIN, a general partner) and CUSHMAN & WAKEFIELD, INC., a corporation ('Agent').

On August 23, 1976, the parties entered into a certain Renting Agency Agreement ('Renting Agreement'), for the 'Premises' described therein. The parties desire to terminate said Renting Agreement as of the day and subject to the provisions hereinafter provided.

THEREFORE, for valuable consideration, each to the other in hand paid, the parties agree as follows:

1. Paragraph 1 of the Renting Agreement is amended by deleting the phrase 'for a term of three (3) years commencing September 1, 1976, and ending August 31, 1979, ...' and substituting in lieu thereof 'for a term ending upon execution and delivery of Leases providing for occupancy of ninety-five per cent (95%) or more of the rentable space of the building ...'.

2. In addition to commissions payable in respect of other Tenants (including any becoming payable by reason of renewals and like matters referred to in paragraph 5) Owner acknowledges that Agent is entitled to and shall be paid a commission on the Lease with Combined Insurance Company of America, in accordance with the provisions of paragraph 5.

In all other respects, said Renting Agreement is ratified and confirmed."

On March 14, 1978, C&W assigned its interest in the Northbrook 500 project to plaintiff. The assignment agreement stated that upon the consent of the Northbrook 500 Limited Partnership, C&W assigned to plaintiff the Agreement of August 1976 between C&W and defendants. On March 15, 1978, defendant Stein agreed to the assignment on behalf of the partnership.

Plaintiff, thereafter, tried to collect commissions from defendants. Defendants refused to pay and informed plaintiff that the project had suffered financial losses because of C&W's overexpending on the tenant improvement budget. Plaintiff filed suit to collect the commissions, and defendants counterclaimed for damages for overspending on tenant improvements. The trial court directed a verdict against defendants' counterclaim, and a jury returned a verdict for plaintiff in the amount of $130,807.12.

Following the jury verdict, plaintiff drafted an order which included $17,551 in prejudgment interest. The trial court entered the order as drafted by plaintiff. Defendants filed a post-trial motion seeking various types of relief, including vacation of the prejudgment interest award. The trial court subsequently vacated its earlier order which awarded the prejudgment interest.

APPEAL

Defendants contend that plaintiff was required to plead and prove that its individual brokers, officers and management personnel, as well as those of its assignor, C&W, were all licensed real estate brokers during the time of the exclusive rental agency agreement. They argue that any recovery of commissions by plaintiff is absolutely barred since the complaint did not allege that everyone involved in the leasing activities, including the corporation itself, were licensed real estate brokers. Defendants also argue that it was error for the trial court to allow plaintiff to present evidence after the close of its case in chief to prove compliance with the licensure statute. In support of their arguments, defendants cite the Real Estate Brokers and Salesmen License Act (Ill. Rev. Stat. 1979, ch. 111, par. 5701 *et seq.*).

Defendants' argument suggests that plaintiff's complaint was defective on its face. Yet, in answering the complaint, defendants did not raise the issue of plaintiff's and its assignor's nonlicensure as an affirmative defense. We note that defendants raised the issue for the first time at the close of plaintiff's case when they moved for a directed verdict based on what they asserted was noncompliance with the statute.

The matter of licensure should have been put in issue by the pleadings. Ordinarily, pleading over to a defective complaint constitutes a waiver of the defect. (*Dunham v. Dangeles* (1978), 67 Ill. App. 3d 252, 255, 384 N.E.2d 836, 838.) If, as defendants suggest, plaintiff should have alleged proper licensure in its complaint, then defendants should have raised the issue as an affirmative defense or in some way put plaintiff and the trial court on notice that the complaint was defective.

■ The trial court was uncertain as to whether plaintiff had to prove licensure under the statute. The court then exercised its discretion in allowing plaintiff to present proof that the statutory requirements were met. (See *Crothers v. La Salle Institute* (1977), 68 Ill. 2d 399, 370 N.E.2d 213.) Prior to defendants' motion for a directed verdict, the trial court had no reason or opportunity to consider the statutory licensure requirement. The trial court avoided making a hasty ruling on defendants' motion until it was apprised of the facts and the law governing the issue. After hearing plaintiff's proof, the trial court found that the statutory requirements had been met. We find no reason to disturb the trial court's ruling.

■ Defendants next contend that plaintiff failed to introduce sufficient evidence to support the jury's finding that it was entitled to the total amount of the commissions awarded. More specifically, they

assert that plaintiff should have introduced during its case in chief the lease for each unit for which it claimed a commission. Since plaintiff introduced leases for only eight of the 22 units for which the jury awarded commissions, the jury's award should be reduced to commissions for just those eight units.

We note at the outset that there is no legal requirement that a lease must be introduced into evidence before a commission can be awarded. The question is whether there was sufficient evidence in the record to support the jury's finding that plaintiff was entitled to the commissions for the leasing of all 22 units. We note also that the parties stipulated to the amount of commissions unpaid at the time of trial and to the admission into evidence of certain invoices on numerous leases other than the Combined Insurance lease. They also stipulated that the building was 95% occupied in July 1978.

According to the terms of the Modification, the parties agreed to terminate the Agreement when the building was 95% occupied. Under the Agreement, C&W, plaintiff's assignor, was entitled to a commission for all leases executed during the term of the Agreement. The Agreement was in effect from August 1976 to July 1978, when it was terminated according to the terms of the Modification. Plaintiff's assignor was the exclusive leasing agent during that period and under the Agreement was entitled to a commission for each lease even if the tenant was procured by a broker other than plaintiff's assignor. The Agreement, given its plain meaning, shows that plaintiff, as assignee, was entitled to a commission for all tenants leasing space in the building during the term of the Agreement.

Additionally, the invoices stipulated to by the parties and admitted into evidence show the amount of unpaid commission, date and term of the lease, space occupied, and amount of rental for each tenant. There was unrebutted testimony at trial that two lists offered into evidence were accurate reflections of the tenants occupying the building during the period of the Agreement for which plaintiff claimed commissions. The billing procedure and payment timetable for the commissions as agreed to by the parties were also submitted into evidence.

While submitting the original copies of the leases for which a commission is claimed might have been the more prudent approach to take, failure to do so does not extinguish plaintiff's claim. In light of the evidence presented and the stipulations of the parties, there was sufficient evidence from which the jury could find that defendants owed plaintiff the commissions claimed. Under these circumstances, this function was well within the province of the jury. See *H. Vincent*

*Allen & Associates, Inc. v. Weis* (1978), 63 Ill. App. 3d 285, 379 N.E.2d 765.

■ Defendants next argue that plaintiff failed to prove that C&W complied with all the material terms of the Agreement. They also contend that plaintiff's failure to allege in its complaint and to introduce into evidence at trial that C&W used its "best efforts" in leasing the building is fatal to plaintiff's case. Additionally, defendants argue that plaintiff should have proved as part of its *prima facie* case that C&W rendered all services pertaining to the leasing of the building and that it negotiated the leases upon terms acceptable to the owner as provided by the Agreement. In other words, defendants claim that C&W failed to perform and, further, that plaintiff failed to prove that certain conditions precedent to the Agreement were performed.

In its complaint, plaintiff pleaded that all conditions required by the Agreement had been performed. Defendants generally denied this in their answer but did not set forth the specific conditions which plaintiff's assignor, C&W, had failed to perform.

To effectively raise an issue concerning a condition precedent, specific facts should have been alleged in the answer to plaintiff's complaint. By failing to do so, defendants have waived that issue. (*Pioneer Trust & Savings Bank v. Zonta* (1979), 74 Ill. App. 3d 614, 616, 393 N.E.2d 548, 551.) It was in this posture that the case proceeded to trial.

At trial, defendants raised the issue of C&W's noncompliance by failing to use its best efforts; they then moved for a directed verdict on this issue, which was denied. The trial court, however, permitted defendants to present evidence in support of their contention that C&W had not used its best efforts. Plaintiff presented rebuttal evidence. The record is unclear whether any evidence was presented in support of the argument that plaintiff did not prove that C&W rendered all services pertaining to the leasing of the building and that it negotiated leases on terms acceptable to the owner. At the close of all the evidence, the issue was submitted to the jury in the form of a specific question as part of the jury instructions. The jury found in plaintiff's favor.

A review of the record does not show the jury's finding to be contrary to the evidence or to Illinois law. We will not disturb that verdict absent a clear showing that it is contrary to the evidence. See *La Grange Metal Products v. Pettibone Mulliken Corp.* (1982), 106 Ill. App. 3d 1046, 436 N.E.2d 645.

Defendants next argue that the Modification was never assigned

to plaintiff; therefore, plaintiff lacks standing to claim a commission on the Combined Insurance lease. They argue that the assignment did not mention the Modification of February 28, 1978, but only dealt with the original Agreement of August 23, 1976. Therefore, the commission for the Combined Insurance lease was never assigned since it is the Modification that grants the commission on that particular lease. We disagree.

The Modification states that it is modifying the original Agreement, and the language makes it clear that both are to be read together. The trial court found that the Modification as well as the original Agreement were to be construed together and that both were assigned to plaintiff.

■ Defendants' contention that Buck lacked authority to sign the Modification on behalf of the partnership was not raised in their answer to plaintiff's complaint. Nevertheless, the trial court had the opportunity to consider it and rejected it. On appeal, defendants offer no novel argument. We agree with the trial court that the language of the Modification and the assignment, given their plain meaning, makes it clear that the Modification and the original Agreement are to be read together and that both were assigned to plaintiff.

Secondly, the jury found from the evidence presented that even if defendant Stein had been responsible for procuring the Combined Insurance lease, as argued by defendants, he was not acting as an outside broker. Therefore, plaintiff was entitled to the full commission of $80,694 and not just a proportionate amount as defendants assert in their alternative argument. The findings of the trier of fact will not be disturbed on appeal unless manifestly against the weight of the evidence. (*Northbrook Trust & Savings Bank v. County of Cook* (1977), 47 Ill. App. 3d 879, 889, 365 N.E.2d 433, 441.) We find no justification for overturning the jury's verdict.

We hold, therefore, that there was sufficient evidence from which the jury could find that plaintiff was entitled to all commissions awarded.

Defendants next argue that the trial court improperly directed a verdict against their counterclaim. The counterclaim charged that plaintiff's assignor breached the Agreement which required it to perform in a "first class" manner and that plaintiff's assignor failed to follow defendants' instructions to negotiate leases within the tenant improvement budget. After hearing the evidence presented by defendants, the trial court found the basis of their counterclaim to be that plaintiff's assignor failed to follow defendants' instruction to maintain tenant improvements at $4.12 per square foot.

The evidence shows that there was no specific instruction by defendants to C&W, plaintiff's assignor, that the $4.12 per square foot for tenant improvement was a set amount that could not be exceeded. The amount was an average based on a general estimate. Defendant Otis testified that he never specifically instructed C&W not to exceed $4.12 per square foot per tenant. There is no such written instruction or limitation in the Agreement.

■ Defendants argue that the counterclaim should have been submitted to the jury notwithstanding the directed verdict against them. We disagree. The thrust of defendants' counterclaim was C&W's failure to maintain tenant improvements at $4.12 per square foot. The evidence showed that there was never a contractual agreement between the parties not to exceed that amount. Defendants' counterclaim seeks to maintain a breach of contract action against plaintiff for something which C&W, plaintiff's assignor, never contracted to do. We agree with the trial court that since there was never a contract on the amount to be spent, defendants could not establish a breach. Therefore, the counterclaim was insufficient as a matter of law.

We hold, therefore, that the trial court correctly directed a verdict against defendants' counterclaim and withheld the question from the jury.

CROSS-APPEAL

We now turn to plaintiff's cross-appeal for prejudgment interest. It argues that there is a statutory right to prejudgment interest because the Agreement is an instrument of writing within the meaning of the statute (Ill. Rev. Stat. 1979, ch. 74, par. 2).

No arguments on the question of prejudgment interest had been presented to the trial court when the order granting such interest was entered. The order entered by the trial court was drafted by plaintiff and included a clause allowing prejudgment interest. Defendants later made a motion to vacate the order. Following a hearing on that motion, the trial court issued an order denying plaintiff's claim for prejudgment interest. A record of that hearing is not before this court on appeal.

Plaintiff's argument relies on the fact that the Agreement was an instrument of writing under the statute (Ill. Rev. Stat. 1979, ch. 74, par. 2), which provides as follows:

> "Creditors shall be allowed to receive at the rate of five (5) per centum per annum for all moneys after they become due on any bond, bill, promissory note, or other instrument of writing;

on money lent or advanced for the use of another; on money due on the settlement of account from the day of liquidating accounts between the parties and ascertaining the balance; on money received to the use of another and retained without the owner's knowledge; and on money withheld by an unreasonable and vexatious delay of payment."

Plaintiff also argues that *Groome v. Freyn Engineering Co.* (1940), 374 Ill. 113, 28 N.E.2d 274, supports its theory that the Agreement was an instrument of writing within the meaning of the statute, entitling it to prejudgment interest. We disagree.

*Groome* was an action in equity, and the court implied that the agreement between the parties was an instrument of writing under the statute and allowed prejudgment interest. However, the facts of that case are inapposite to the case at bar. The court in *Groome* stated that under the particular facts of that case equity dictated an award of interest on the amount owed. That principle is not applicable to the facts of this case.

Absent an express agreement between the parties, allowance of prejudgment interest is permitted by statute (Ill. Rev. Stat. 1979, ch. 74, par. 2) if the amount due is a fixed amount or easily computed. (See *Stevenson v. ITT Harper, Inc.* (1977), 51 Ill. App. 3d 568, 366 N.E.2d 561.) Therefore, even if the Agreement in this case meets the statutory requirement for an instrument of writing, it must also satisfy the requirement of a fixed or readily ascertainable amount. The commission sought by plaintiff was disputed by defendants. The dispute was finally resolved by the jury's award. The amount of the commission was dependent upon many factors such as amount of rent, length of the lease, and the procuring broker (see paragraph 5 of the Agreement).

■ The trial court heard the argument of the parties and determined that plaintiff did not meet the requirement for prejudgment interest. Our analysis of the facts and the statutory requirement, as well as case law, show no error or abuse of discretion by the trial court.

We hold that the trial court did not err in its denial of plaintiff's claim for prejudgment interest.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

LINN and JIGANTI, JJ., concur.