**U.C. CASTINGS COMPANY,**
**Plaintiff-Appellee,**

v.

**Lester B. KNIGHT and LBK Investment Company, Defendants-Appellants.**

**No. 83–2136.**

United States Court of Appeals,
Seventh Circuit.

Argued May 23, 1984.

Decided Feb. 7, 1985.

Rehearing Denied March 13, 1985.

Frank Cicero, Kirkland & Ellis, Chicago, Ill., for plaintiff-appellee.

John Powers Crowley, Cotsirilos & Crowley, Ltd., Chicago, Ill., for defendants-appellants.

Before CUMMINGS, Chief Judge, COFFEY, Circuit Judge and WYATT, Senior District Judge.*

WYATT, Senior District Judge.

After a jury trial in this diversity action in the Northern District of Illinois (Judge

---

* The Honorable Inzer B. Wyatt, Senior District Judge for the Southern District of New York, is sitting by designation.

Paul E. Plunkett), the jury returned a verdict on March 31, 1983, for plaintiff of $1,300,000 on two counts, one for breach of warranty and one for fraud, both claims based on the purchase by plaintiff of all the stock of a closely held company. The trial court thereafter, by order dated May 20, 1983, and entered in the docket May 26, 1983, granted to plaintiff interest in an amount later calculated as $604,446. The two defendant sellers appeal from the judgment on the verdict and from the order awarding interest.

We affirm the judgment for plaintiff on the jury verdict and the order of the district court granting interest to plaintiff in the amount stated.

### 1.

Universal Castings Corporation ("Universal") has been for many years a manufacturer at Chicago of precision castings from metals other than iron. Defendant Lester B. Knight, until the sale of his interest to plaintiff on December 29, 1977, was, and had been since as early as about 1947, the dominant figure in Universal. Knight and his family, directly or indirectly, owned substantially all the stock of Universal. Defendant LBK Investment Company ("LBK") was a personal investment company of Knight, holding shares of Universal. Three executives of Universal owned a relatively small number of its shares.

Plaintiff U.C. Castings Company ("UC") is an Ohio corporation with its principal place of business in Beachwood, Cuyahoga County, Ohio (a suburb of Cleveland). John P. Keller was the chief executive of plaintiff and the chief figure for plaintiff in the events in suit. It seems fair to assume that UC was organized by the Keller family in late 1977 to hold, when purchased, the stock of Universal.

Knight had for several years been trying to sell all his stock in Universal. In October 1977, Keller was interested in buying Universal and began negotiations with Knight. There were meetings with Knight; Keller visited the Universal plant several times and talked with its operating officials. The principal of these were Wilkins

(vice-chairman, formerly president for 22 years), Lamb (president for the then past 8 years, formerly vice-president), Johnson (treasurer and chief financial officer), Muth (a consultant, formerly plant manager for 22 years), and Lamb, Jr. (plant manager). Financial statements of Universal were given by Knight or at his direction to Keller, who studied them. At a meeting on December 5, Knight offered to sell all of the stock of Universal for $4,000,000. Keller expressed a preference to buy assets and was not willing to pay Knight's price for the stock. The negotiations terminated, and a few days later Keller returned to Knight the financial statements and other material given to him.

Two weeks later, on December 19 or 20, Knight from Florida telephoned Keller in Ohio, said he was ill, was using a heart machine, and would sell all the stock of Universal for $3,600,000 provided, among other things, he could get a part payment in 1977 (which meant the deal had to be completed before the end of the month of December). Keller consulted his father and they agreed to accept the offer. Keller called Knight back on the same day; he told Knight that the papers could be completed by the end of the month and that the offer was accepted.

Keller then started his lawyer, Sullivan, working on the papers; Knight did the same thing with his lawyer, Murphy.

Keller sent his accounting firm to Universal to check into their bookkeeping procedures and to look for "any red flags". Two men from the firm spent a day at Universal and reported to Keller that it was a "good company", that the books were kept in "an old fashioned system but they looked clean".

Murphy and Sullivan worked together in Murphy's offices in Chicago on Thursday, December 22. Sullivan presented a draft stock purchase agreement; Murphy and he went over the draft together, discussing changes. Murphy told Sullivan that certain exceptions had to be made to warranties, that he did not know what the excep-

tions would be, and that he would find out from management.

Keller met with Murphy and Sullivan on Friday, December 23. They reviewed the changes made in the purchase agreement the day before. Murphy then went on December 23 to Universal and met with Wilkins, Lamb, and Johnson. He went over with them all of the representations and warranties in the agreement, asking as to their accuracy and as to the exceptions needed. At Universal, Murphy drafted Exhibit C to the stock purchase agreement to contain the exceptions to the warranties.

Paragraph 4 of Exhibit C was apparently meant to relate to a subject which occupied the principal attention at trial and on this appeal. This subject is the practice followed by Universal which is euphemistically called by counsel for Universal, and by its management, "shipping into the next month", but which, it will be seen, is more accurately to be described as "backdating invoices and revenues". As drafted by Murphy, paragraph 4 of Exhibit C read as follows (DX 4; "DX" refers to "Defendants' Exhibit"):

> "The Company has for the past several months invoiced some customers in advance of shipments being made about two weeks. At _____ November 30, 1977, the aggregate of invoices covering such shipments was about $_____."

According to Murphy (T 906–7; "T" references are to pages of the stenographic transcript), he was told by Wilkins that many years ago the company, to improve its cash flow, adopted the practice of billing at the end of the month for castings to be made in the first few days of the following month. The jury could have found that, if this were told to Murphy, it was only partly true.

On the next day, Saturday, December 24, Murphy went back to Universal to finish Exhibit C. As to paragraph 4, he asked for a figure of the approximate dollar amount at that time of invoices where shipments were to be made in the next month; he was later told by Universal that the figure was $200,000 (T 923).

On December 27, Murphy flew to Florida and went over the papers with Knight, specifically all of the exceptions in Exhibit C. Knight signed the stock purchase agreement; his wife and their son, Charles Knight, also signed. Murphy returned to Chicago in the evening of December 27.

On the afternoon of Thursday, December 29, the execution of the stock purchase agreement took place in Murphy's office in Chicago. Sullivan came early to Murphy's office; Murphy gave Sullivan the completed exhibits to the stock purchase agreement and he went to another office and studied the final form of the papers. According to Keller, he came to Murphy's office a half hour before the "scheduled closing which was late in the afternoon on December 29" (T. 103). Keller, when he arrived, reviewed the papers with Sullivan.

Having reviewed the papers together, Keller and Sullivan then went to the closing in an adjoining office to represent the purchaser. For the seller were Murphy, the lawyer, with Lamb, Wilkins and Muth. There was some discussion and the necessary documents were signed by Keller for the purchaser and by Lamb, Wilkins and Muth as sellers. All of the stock of Universal then passed to the purchaser and was duly paid for, the price being in total $3,600,000, paid partly in 1977 and partly in 1978.

After control of Universal thus passed to plaintiff, Keller for a time kept the same management, in particular Wilkins, Lamb, and Johnson.

Under date of March 6, 1978, Price Waterhouse, outside accountants for Universal, transmitted to Universal unaudited financial statements as of December 31, 1977, based on the company's own books and records (PX 28). These showed a profit after taxes for 1977 of $244,300. Price Waterhouse, however, did not know of the backdating practice and had been deceived by Universal as to its recording of sales and revenues (T 669–676).

On the basis of a statement (later to be discussed) at the closing by Wilkins about a

"scheduling problem" in 1977, purported to be covered in paragraph 4 of Exhibit C on the basis of the failure of the corrective program Wilkins had then described, and on the basis of the recommendations of Wilkins and Johnson, Keller had ordered that at the end of March 1978 there be a "clean cutoff" and that no back credits to income be made for any shipments taking place after the end of work the last business day of March 1978 (T 121–22).

Then, in April 1978, Keller reviewed the income and other financial statements for the month of March 1978. According to Keller, they showed a "shocking loss" for that month, a loss of somewhere between $94,000 and $97,000, which Keller could not then understand but which can now be seen as the result of a sudden stopping of the practice at Universal of borrowing income from the future by backdating to the month before enough sales to show the desired profit for that earlier month (T 121–123).

Keller asked Johnson for an explanation of the loss for March 1978 but the Court, on objection of defendants, would not permit Keller to relate what Johnson told him (T 124). It is a natural inference that Johnson made a partial disclosure that Universal had inflated recorded income by inclusion of income from shipments in a later period. Keller asked if the same condition, the offered explanation for the March loss, had existed on December 31, 1977. Again, an objection was sustained to what Johnson replied (T 125), but it may be inferred that Johnson disclosed the use of income from shipments made in the month of January 1978 to increase income recorded for December 1977.

As a result of the disclosures (however incomplete) of Johnson, Keller had reason to believe that the income for 1977 reflected in the financial statements sent by Price Waterhouse under date of March 6, 1978, was too high and was not correct. Accordingly, he instructed Johnson to have Price Waterhouse make a second study of the year 1977 in order "to revise the De-cember 31, 1977 financial statements and income tax returns" (T 125).

Johnson then asked Price Waterhouse to come back and "reissue" the 1977 financial statements because Universal had included about $200,000 of January 1978 shipments in December 1977 sales (T 715). Dean, a manager of Price Waterhouse, went back to Universal and discussed with Universal officers, principally Johnson, what were claimed to have been "errors" by Universal. A representation letter, dated May 24, 1978, was given to Price Waterhouse by Lamb and Johnson (PX 22). This letter represented in substance that there had been "errors" and that shipments made in January 1978 had been "erroneously in-cluded as sales in December, 1977". Figures were given to show that the "effect of the error" was to overstate sales, accounts receivable, and income for 1977. It was made to appear in the letter that there had been a single, isolated incident of error which Universal was correcting. Nothing was said in the letter about a 25 year practice of Universal to backdate invoices and revenues, nor that the practice existed in 1976, nor that there had been similar "errors" in 1976. Nothing of any of this was disclosed to Price Waterhouse, nor was there any suggestion of the "wash" theory now asserted in this action by defendants.

Under date of May 24, 1978, Price Water-house transmitted to Universal a second set of unaudited financial statements as of December 31, 1977 (PX 29). Reflecting changes brought about by the "errors" of Universal in recording January 1978 ship-ments as December 1977 sales, this second set showed a profit after taxes for Univer-sal in 1977 of $158,049, as contrasted with $236,629 for the same period shown in the statements warranted to Keller as correct.

It was thus that Keller began to learn about the accounting practices of Univer-sal. Keller believed that these practices had caused the represented earnings for Universal in 1977 to be higher than they actually were. It cannot be determined from the record how and when Keller dis-covered the deliberate falsification of

records by Universal, the backdating of invoices and revenues, and the continuous existence of the practice for some 25 years. In any event, he finally concluded that the earnings had been falsely represented and warranted to plaintiff, that too much had been caused thereby to be paid by plaintiff for the stock of Universal, and that plaintiff should bring an action for damages.

### 2.

This action was commenced by plaintiff U.C. Castings Company in the United States District Court for the Southern District of Florida (West Palm Beach Division) on December 10, 1979. The defendants named were Lester B. Knight and LBK Investment Company.

There were four counts in the complaint. Count I was for breach of representations and warranties. Count II was under the Securities Exchange Act of 1934 ("the 1934 Act"). Count III was under the Securities Act of 1933 ("the 1933 Act"). Count IV was for common law fraud. Jurisdiction was based on diversity of citizenship (which was admitted at oral argument to exist), as well as on the jurisdictional sections of the 1934 Act (15 U.S.C. § 78aa) and of the 1933 Act (15 U.S.C. § 77v); and on pendent jurisdiction.

Defendants filed an answer and moved under 28 U.S.C. § 1404(a) for a change of venue transferring the action to the Northern District of Illinois for the convenience of parties and witnesses.

By order filed July 9, 1980, the district court in Florida granted the motion of defendants and ordered the action transferred to the Northern District of Illinois.

### 3.

On August 8, 1980, the original file transmitted from the Southern District of Florida and a certified copy of the docket entries in that District were filed and docketed in the Clerk's office in the Northern District of Illinois under file number 80 C 4169; the action was assigned to Judge McGarr.

On November 18, 1981, defendants filed a motion for summary judgment on Counts II and III of the complaint and for dismissal of counts I and IV for want of subject matter jurisdiction.

By order with memorandum opinion, filed February 10, 1982, Judge McGarr granted the motion for summary judgment on counts II and III and denied the motion to dismiss counts I and IV.

As to counts II and III, based on the 1934 Act and the 1933 Act, the district court ruled that the federal securities laws did not cover the sale of all the stock of Universal, relying on the decision of this Court in *Frederiksen v. Poloway*, 637 F.2d 1147, *cert. denied*, 451 U.S. 1017, 101 S.Ct. 3006, 69 L.Ed.2d 389 (1981) which in turn relied on the policies and purposes of the federal securities laws emphasized in *United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 95 S.Ct. 2051, 44 L.Ed.2d 621 (1975).

As to counts I and IV, the district court rejected the arguments for defendants and found that there was complete diversity of citizenship and, thus, jurisdiction.

Plaintiff, by leave, filed an amended complaint on July 8, 1982. Count I of the amended complaint was the same claim for breach of warranty as count I of the complaint; count II of the amended complaint was the same claim for fraud as count IV of the complaint; count III of the amended complaint was a new claim for negligent misrepresentation under Illinois law; count IV of the amended complaint was the same claim as count II of the complaint (as claim under the 1934 Act, dismissed on motion as earlier explained).

Defendants then moved to dismiss counts III and IV of the amended complaint.

By order with memorandum opinion, filed October 7, 1982, the district court granted the motion of defendants and dismissed counts III and IV of the amended complaint.

As to count IV of the amended complaint, it appeared that plaintiff reasserted this claim only because a Second Circuit decision, *Golden v. Garafolo*, 678 F.2d 1139 (1982), had been contrary to that of

this Court in *Frederiksen v. Poloway*, above cited. The district court correctly felt bound by the *Frederiksen* decision.

As to count III of the amended complaint, the district court ruled that the Illinois law on which plaintiff relied was entirely inapplicable to the situation in the case at bar.

No point is made on this appeal about the dismissal below of any of the claims in the complaint or amended complaint.

On January 17, 1983, the action was reassigned in the district court from Judge McGarr to Judge Plunkett.

On Monday, March 21, 1983, before Judge Plunkett and a jury the action went to trial on count I (breach of warranty) and count II (fraud) of the amended complaint. The trial continued until Wednesday, March 30, when the case was given to the jury. The jury returned a verdict the next day for the plaintiff on the two counts for breach of warranty and fraud; the jury found that plaintiff suffered damages of $1,300,000.

There were then a number of post trial hearings, motions and decisions, which it will be necessary later to discuss in more detail in connection with that part of this appeal relating to the award of interest.

There was a judgment for plaintiff entered in the docket on April 8, 1983, and an order dated May 20, 1983, awarding interest to plaintiff.

By notice of appeal filed June 17, 1983, the defendants brought here for review the April 8, 1983, judgment and the May 20, 1983, order.

### 4.

■ The argument of appellants for reversal of the award based on the jury verdict is that the jury findings of breach of warranty (count I) and fraud (count II) were "contrary to the manifest weight of the evidence" (Brief, pp. 16, 28). The test of a jury verdict on appeal, however, is not whether it was against the weight of the evidence. The test is whether there is a "reasonable basis in the record for the verdict" (*Wyant v. J.I. Case Co., Inc.*, 633 F.2d 1254, 1256 (7th Cir.1980)), whether "there is an evidentiary basis for the verdict" (*Musgrave v. Union Carbide Corp.*, 493 F.2d 224, 229 (7th Cir.1974)). If this test is met, an appellate court will not reweigh the evidence but will let the verdict stand. "Because great deference is accorded to the jury's judgment in this circuit, it is well-established that a jury verdict will not be set aside if a reasonable basis exists in the record to support that verdict." *Spesco v. General Elec. Co.*, 719 F.2d 233 (7th Cir.1983).

Appellants also argue that the amount of the award was "speculative" (Brief, p. 29) and "excessive" (Brief, p. 35).

As a third argument, appellants contend that the award of interest was contrary to Illinois law.

We discuss the three arguments in the order above set out.

### 5.

■ There is ample evidence in the record supplying an entirely reasonable basis for the jury's verdict on both counts.

The stock purchase agreement (PX 1; "PX" refers to "Plaintiff's Exhibit") had as attachments balance sheets and income statements for the years 1974, 1975 and 1976 and for the eleven months ending November 30, 1977. Defendants represented and warranted that these were "correct and complete" and "prepared on the basis of consistently applied accounting principles", that the balance sheets "present fairly" the financial position, and that the income statements "present fairly" the results of operations. Defendants separately represented and warranted that the "books and records" of Universal were "correct and complete", were "maintained in accordance with sound business practices", and "accurately reflect the basis for the financial conditions and results of operations" reflected in the financial statements attached to the stock purchase agreement.

On the financial statements represented and warranted by defendants, the earnings of Universal after income taxes were shown as follows:

| 1974 | $285,644 |
| 1975 | 367,445 |
| 1976 | 299,442 |
| 1977 | 236,629 (11 months) |

The financial statements of Universal were not audited. Universal employed Price Waterhouse as outside accountants to prepare unaudited statements and tax returns. In consequence Price Waterhouse accepted the company's books and records without making any verification by generally accepted audit standards. The statements and returns were those of the company, not certified in any way by Price Waterhouse (T 628–29).

### 5a.

The practice of backdating invoices and revenues at Universal had the intended result of recording revenue in the month before that in which the revenue was actually earned. Sales should be recorded as of the date of shipment and revenue recognized at the time of shipment; such was stated to Price Waterhouse to be the policy of Universal (T 633–36).

The object of the practice of backdating invoices and revenues was to show sales income in each month of about three times the amount of the labor cost for that month; the ratio might vary down to 2.7 to 1 for sales income to labor costs (T 390–91). The actual costs were recorded in each month as they were incurred (T 397).

After a month had ended, the ratio of sales income to labor costs was known, and if the shipment of castings in that month had not resulted in sales income sufficient for a ratio of about 3 to 1, sales to labor costs, as appears to have been always the case, then sales income from shipments in the following month would be backdated up to a dollar amount sufficient to bring about the desired ratio; the customers would be sent invoices on the date of shipment but the invoices would be backdated to the last business day of the earlier month (T 491–93).

In selecting shipments in a month to be backdated to the month before, Universal management would use the shipments made in the beginning of the later month. In 1977, the dollar volume of shipments to be backdated was decided by the President (Lamb) and Plant Manager (Lamb, Jr.) (T 266).

The shipping department prepared a packing slip at the time of actual shipment (an example of a packing slip is PX 69–2) and normally would date the packing slip the date of actual shipment. If the income was to be recorded in the earlier month, however, the shipping department would backdate the packing slip to the last business day of the earlier month (T 385–387).

From the shipping department, the packing slip would go to the accounting office where the invoices were prepared from the packing slips. The invoice is the bill to the customer for the selling price in dollars of the castings shipped. The invoice, among other things, shows an "invoice date" and a "date shipped" (an example of an invoice is PX 69–1). The accounting office used the date of the packing slip as the "date shipped" and the "invoice date" was made the same as the "date shipped". The invoice would then be sent out to the customer on the actual date of shipment, but the invoice, because it and the packing slip had been deliberately backdated, would show a false "invoice date" and a false "date shipped", namely, the last business day of the earlier month (T 387–390).

The sale represented by the backdated invoice would appear as a sale in the earlier month, as income in that month, and as part of the profit in that month. Thus, the profit in the earlier month would have been inflated by false entries. Universal purported to record sales as of the shipment date and to recognize revenue upon shipment. The backdating, however, meant that false dates of shipment were used at Universal and that in consequence the financial statements were not accurate.

The backdating practice as just described had been employed by the management for a long time, for at least 25 years (T 248, 383–84, 422). The jury could have found that one of the motives for the practice was continuously to record income from the fu-

ture and thus to increase profits shown so that when Universal should be offered for sale, its profits record would appear better than it really was.

The backdating practice not only inflated profits for the earlier month by attributing income to that month from a later month, but it additionally inflated profits because costs related to the attributed income were not carried back and matched with such income. It is a basic accounting principle that when revenue is recorded, all costs related to that revenue must also be recorded so as to match (T 636). The chief financial officer of Universal admitted that the mismatch between revenues and expenses on backdated shipments was one of the reasons accurate financial statements could not be produced in 1977 (T 285).

The management of Universal knew that the backdating practice was wrong and in 1977, when the volume of backdating increased (T 261–265), were concerned and discussed their concern together. Johnson emphasized that because of backdating, the financial statements did not reflect the true earnings of Universal. The three officers agreed that the practice should be stopped and on two occasions in 1977 so recommended to Knight. He, however, rejected the proposal and it was decided to continue the practice. Knight told the three officers "to maximize the profit" but "to try to cut the days" (T 410–20, 503).

The backdating practice makes it virtually impossible, as a practical matter, to determine from the books and records of Universal what income in a given period had been falsely attributed to that period. It would be necessary to determine the dates of actual shipments of the castings in each invoice which is dated the last business day of the period. To do this, the date of actual shipment on the bill of lading or United Parcel record for each shipment would need to be compared with the invoice for that shipment; if the date of actual shipment corresponded with the "date shipped" shown on the invoice, the revenue was correctly attributed to the period; if the date of actual shipment did not corre-spond with the "date shipped" on the invoice, then the invoice had been backdated from a later period and had been wrongly attributed to an earlier period (T 346–48).

### 5b.

Despite the settled nature for many years of the backdating practice at Universal, the significance of the practice as falsifying the financial statements by overstating income, and the representations and warranties made in the sales documents and otherwise, there is evidence that nothing whatever was disclosed to plaintiff about the practice.

Wilkins, the vice-chairman of Universal, testified that he said nothing to Keller or anyone else from plaintiff about the practice and that nobody else from Universal said anything to plaintiff about the practice (T 433–34).

Keller testified that, having read paragraph 4 of Exhibit C to the stock purchase agreement, he asked about this at the closing on December 29, 1977. Wilkins answered his question, according to Keller (T 111):

> He said, "There's no real problem there. I have been—" "I" being Wilkins "—have been working with Will Lamb, Mr. Lamb's son, the plant manager, for the past few months on this scheduling problem, and we have been making some progress, about $50,000 a month, and it will all go away, and we will be current some time in April of 1978."

The jury could well have found this answer deliberately deceptive; nothing is said about the backdating of invoices and revenues, about the many years the practice had been followed, or about its objective to inflate profits. The answer treated the 25 year backdating practice as a temporary "scheduling problem". Nothing else was said by the sellers at the closing on the subject (T 111–12).

It is not surprising that nothing was disclosed by Universal to plaintiff about the backdating practice because nothing was disclosed by Universal to its own out-

side accountants about the practice (T 679, 714).

The argument for appellants in this respect is (Brief, p. 17) that the "practice of shipping into the next month [backdating invoices and revenue] was fully disclosed to plaintiff in the Stock Purchase Agreement", referring to paragraph 4 of Exhibit C to that agreement, which in final form reads as follows:

> The company has for the past several months invoiced some customers in advance of shipments being made about two weeks. At December 31, 1977, the aggregate of invoices covering such shipments is expected to be about $200,000.

The argument, while bold, is without merit. The quoted disclosure, on the contrary, could well be taken by the jury as evidence of an intent to defraud. There is no indication whatever in paragraph 4 that it is intended to refer to backdating or to (the better sounding) "shipping into the next month"; neither of these expressions is even used in paragraph 4. If the quoted paragraph 4 does refer to the backdating practice, the jury would have been justified in finding it false and deceptive. It does not refer to a practice which extended over more than 25 years; it refers to something which the company has done only "for the past several months". It says nothing of what was actually done to backdate shipments and increase income for an earlier month by false entries. Instead it states that invoices for castings were sent to customers *before* the castings were actually shipped to them; the jury could find from evidence that the invoices were actually sent *at the time of* shipment of the castings, but that the invoices were backdated to the earlier month so as to show increased profits for that month. There was nothing in paragraph 4 to alert the plaintiff that the warranted profits on which it had relied had been overstated and should be investigated.

The jury finally had the expert testimony as to accounting of a partner of Price Waterhouse, who was an expert as to the correctness of business procedures affecting the financial records of an industrial company. The Brief for Appellants (p. 12) itself summarizes this testimony as follows:

> ... SINM ["shipping into the next month"] was not a generally accepted accounting procedure, it was not properly recorded in the financial records of the company, it was an irregular procedure not reported to Price Waterhouse, the aggregate amounts of sales and inventory were not accurately recorded, and the financial statements did not present fairly the financial position of operations.

**5c.**

There was thus a "reasonable basis in the evidence" for the findings of the jury of a breach of the warranties by defendants (count I) and there was "clear and convincing evidence" for the finding of the jury of fraud (count II). While there were conflicts in the evidence as to some matters of fact, there was a degree of confusion in the testimony, and there were issues of credibility, it was the jury's function to resolve these by its verdict. There was a reasonable evidentiary basis for that verdict.

**6.**

■ The second argument made for appellants (Brief, pp. 29–36) is that the $1,300,000 damages found by the jury to have been suffered by plaintiff is "speculative" and "excessive".

The trial court instructed the jury that if defendants were found liable, the plaintiff was entitled to recover as damages the difference between the price paid for all the stock of Universal ($3,600,000) and the fair value of that stock on December 30, 1977 (T 1608, 1614). There was no objection to this instruction by defendants at the trial, nor is there any objection raised on this appeal. At least for purposes of this appeal, the instruction must be taken as correct.

As to damages, therefore, the issue for the jury was simply the fair value of all the stock of Universal at December 30, 1977.

The jury on this issue accepted the evidence of Mr. Hansen, who testified (T 733–825) as an expert for plaintiff. Hansen, on the record, was shown to be highly competent as an expert. He is executive vice-president of a leading investment management firm in Chicago which, among other financial services, has specialized for some years in valuations of privately and publicly owned companies. He has had many years of experience in financial work and has been engaged in valuation work for most of his professional life. There can be no question as to his qualifications.

In addition to financial statements of Universal and testimony and exhibits in the case at bar, Hansen read material on competitors and otherwise comparable companies in the same industry.

Hansen testified that in his opinion the fair market value of all the stock of Universal on December 30, 1977, was $2,300,000 (T 791).

In forming this opinion, Hansen first "adjusted the company's earnings to arrive at a more true earnings figure for the company to eliminate the practice whereby the company had been including in it sales, shipments that were actually occurring in a subsequent period" (T 792). This resulted in a figure of $210,000 for the year 1977.

Next, the earnings were capitalized, using a price/earnings multiple of 7. Hansen explained that this multiple was not higher because of the risks involved from the inaccuracy of Universal's financial statements and the inability of a buyer to trust those statements, because the backdating practice had resulted in difficulties in operating, and because the backdating practice showed major risk at Universal "in terms of the integrity and honesty of the management" (T 801). Hansen also tested the multiple by looking at multiples being paid for similar companies, and by doing a discounted cash flow to see the rate of return on Universal's earning power (T 801, 802).

Multiplying 1977 earnings of $210,000 by 7 yielded $1,470,000, to which Hansen added the $1,000,000 in cash which the company had on hand, for a total of $2,470,000.

This cash had to be added, according to Hansen, because it was not needed to generate the earning power of Universal (T 795).

Next, Hansen subtracted from the total of $2,470,000, the $175,000 to be paid by Universal to Knight under the consulting agreement which was part of the stock purchase transaction. This was done to arrive at a net value for the stock to compare with the price paid for the stock (T 795).

The final result was a fair value for the Universal stock of $2,295,000 or, in round figures, $2,300,000.

The jury accepted this as the fair value of all the stock of Universal on December 30, 1977, and, under the trial court's instructions, found that plaintiff had suffered damages of $1,300,000—the difference between the fair value of $2,300,000 for the Universal stock and the $3,600,000 paid by plaintiff for that stock.

The contentions for appellants as to the evidence of Hansen are two: (1) that the earnings figure of $210,000 which he used for 1977 is based upon "conjecture" and that earnings for that year are "unascertainable" (Brief, p. 30); and (2) that use of a price/earnings multiple of seven in making a valuation of Universal is improper because Knight would not have sold at that multiple (Brief, p. 32).

■ It is true that the false entries in the books of Universal made it difficult, if not impossible, to arrive at a mathematically precise figure for earnings in any given year or month. But a just and reasonable estimate of earnings for 1977 could be made from the evidence, and was made for appellants themselves by their expert accounting witness, Ruona, who prepared an exhibit showing the adjustments which he claimed should be made to recorded net income to obtain a correct earnings figure for 1977 (DX 32; T 1354–71). There was thus a conflict in the evidence; the jury accepted the testimony of Hansen, rather than that of Ruona. Hansen carefully explained how he adjusted the recorded in-

come for 1977, how he had a number of different results, how he compared his results with those by others (including the revision by Price Waterhouse showing $158,049 as net income for 1977, PX 29), and how he used $210,000 as 1977 income, it being the highest income from the several calculations he made (T 798, 796–799). The highest income for 1977 would lead to the highest value of the stock of Universal on December 30, 1977 [and would be the value most favorable to defendants]. The appellants can scarcely be heard to object if their misconduct in backdating invoices and revenues compels the use of a reasonable approximation of the precise income. "[T]he requirement of certainty does not necessitate mathematical precision in fixing the amount of damages nor does it permit defendant to complain of the resulting uncertainty where his wrongdoing caused the difficulty in ascertaining the precise extent of actual damages; only a reasonable basis of computation is required for the submission of the question of damages to the jury." *Hannigan v. Sears Roebuck & Co.,* 410 F.2d 285, 293 (7th Cir.), *cert. denied,* 396 U.S. 902, 90 S.Ct. 214, 24 L.Ed.2d 17 (1969).

The contention that the use of any price/earnings multiple in determining the value of Universal is unwarranted, deserves little notice. The contention (Brief for appellants, p. 32) is based on the fact that Keller never offered to buy for a price earnings multiple and Knight never asked less than $3.6 million. These circumstances are irrelevant. The issue was not what Keller would have paid, had he known all the facts, nor what Knight had asked as his selling price. The issue as to damages, as submitted to the jury without objection, was the fair value of Universal stock on December 30, 1977.

The finding of damages by the jury, as in other respects, has a reasonable basis in the evidence.

### 7.

A separate part of this appeal is from the award below by the trial judge of $604,446 in interest to plaintiff. There was a degree of confusion, procedurally, in the court below and to understand what happened will require a somewhat detailed recital.

The plaintiff in its amended complaint demanded, in each of the two counts on which it prevailed, "interest on its damages from December 30, 1977 [the date of the stock purchase agreement]".

Early in the trial, during the direct examination of Keller (T 167–171), plaintiff gave notice that it had borrowed from a bank the entire $3,600,000 purchase price and that, to the extent of the overpayment said to have been caused by breach of warranty, it claimed *as an element of damages* the actual interest paid to the bank on the amount of the overpayment. Plaintiff claimed that actual interest paid was recoverable under the agreement of indemnity in Section 6.2 of the stock purchase agreement, to be awarded by the jury as part of its verdict on damages. This claim, based on the indemnity agreement, is for interest actually paid, for such interest as an element of damages to be determined by the jury as opposed to interest *on* damages (the expression used in the amended complaint) to be determined by the court as a matter of law.

The parties on March 24, 1983, filed memoranda for the trial judge. Plaintiff did not refer to its interest claim as one for "pre-judgment interest" but as one for "interest as an element of damages" (*e.g.,* Memo, p. 1). Defendant argued (Memo, p. 1) that plaintiff was "attempting to recover pre-judgment interest".

Judge Plunkett on March 25 stated: "it is my conclusion that because of the indemnity agreement itself and because of general case law dealing with fraud in contract in the State of Illinois that interest damage is appropriate in the case" (T 828).

The plaintiff then offered two exhibits, PX 71 and PX 76, relating to actual interest paid by plaintiff, and recalled Keller, who testified to the borrowing by plaintiff of all of the $3.6 million purchase price. The court reserved decision on the admissibility

of PX 71 and PX 76. The plaintiff then rested (T 865).

Later, on March 28, Judge Plunkett suggested that counsel agree "that we won't let the jury consider the interest, we will just have them assess the damages and leave it to the Court by way of post-trial proceedings to fix the interest charges based on the law" (T 1455). The next day counsel did so agree (T 1468).

The exhibits offered to show actual interest paid, PX 71 and PX 76, were then withdrawn by plaintiff (T 1487).

The docket shows that after the verdict and on the same day (March 31) judgment was entered for plaintiff against defendants.

There is a docket entry on April 8, 1983: "This Court amends judgment on the jury verdict as follows: Plaintiff is awarded $1,300,000, plus costs, and question of interest is reserved until May 31, 1983".

The plaintiff on April 8, filed an "amended motion to alter or amend judgment". This motion recited the jury verdict, that the judgment as entered "makes no provision for interest damages for plaintiff", and that the parties had agreed that "the issue of interest damages would be tried to the Court, not to a jury". Plaintiff asked for an order amending the judgment so as "to include interest damages".

There was a hearing on May 20, 1983, on interest and other subjects. Judge Plunkett made this statement: "On the question of interest I conclude that under the indemnity clause as well as other case law that interest is appropriate. I also conclude that the appropriate measure of interest is not what was actually paid by ... [plaintiff] ... but, rather the 9% statutory interest and, accordingly, I am going to award interest on the ground that that was covered, I think, by the indemnity clause as an expense incurred as a result of the finding by the jury that there was a misrepresentation by Mr. Knight" (Transcript of the hearing, pp. 2–3). There was a discussion as to the rate of interest; the trial judge indicated that he was applying the rate in the Illinois statute used in the *Cant* case, which went from 8% to 9% between the purchase and the trial.

There is a notation by a minute clerk dated May 20, 1983, docketed on May 26, 1983, which reads in relevant part as follows:

.Plaintiff's demand for an award of prejudgment interest is granted. Plaintiff is awarded interest from the date of purchase as shown in Section 3 of Chapter 74 of the Illinois Revised Statutes. *Id.* at 974. See *Cant v. A.G. Becker & Co., Inc.,* 379 F.Supp. 972 (N.D.Ill.1974) and *Burrus v. Itek Corporation,* 46 Ill. App.3d 350, 357, 4 Ill.Dec. 793, 360 N.E.2d 1168 (1977).

On May 27, 1983, counsel for plaintiff filed a document entitled "Plaintiff's interest damages pursuant to court order of May 20, 1983". This document contained calculations of interest on $1,300,000 at 8% from December 30, 1977, to December 31, 1979, and thereafter to May 20, 1983 at 9%. The total of this interest was $604,446. The document concluded by requesting the district court to award plaintiff by judgment "its jury award of $1.3 million, its interest damages of $604,446, and its costs of $5,284.92".

Then on June 17, 1983, the defendants filed their notice of appeal from the April 8 judgment and the May 20 order.

Under date of July 15, 1983, Judge Plunkett signed an order awarding plaintiff "as its interest damages" the sum of $604,-446.

It appears that plaintiff made a written motion for leave to file PX 71 with the Clerk. The written motion does not seem to be included in the record. There was a hearing on July 22 of this motion and of other matters. There is an order in the record, signed by Judge Plunkett on July 27, 1983. The order, among other things, grants the written motion of plaintiff and in so doing recites that PX 71 "was offered to the Court and considered by it in deciding issues regarding plaintiff's claim for interest damages". The order also directs that material filed pursuant to the order be

transmitted to this Court in connection with the appeal of defendants.

### 7a.

The jurisdiction of the district court was based only on diversity of citizenship and the law of Illinois was applicable as to the claim for interest.

■ A claim for interest before judgment may be based on an express agreement between the parties or on an entitlement as a matter of law, common law or statutory. A claim to interest based on express agreement is for interest as an element of damages to be awarded by the trier of fact, whether court or jury. A claim to interest as a matter of law is for the court to decide and is for interest *on* the damages awarded by the trier of fact, whether court or jury.

In Illinois, pre-judgment interest is governed by statute, *Ill.Rev.Stat.* (1981) ch. 17, § 6402. So far as appears in the record, plaintiff has never relied on the cited statute for its interest claim nor did the district court base its award on that statute.

■ "In Illinois, the general rule is that pre-judgment interest cannot be awarded unless provided by statute or agreement of the parties". *In re Air Crash Disaster, etc.*, 644 F.2d 633, 638 (7th Cir.1981). We are unable to find any provision in the statute which would authorize an interest award to plaintiff.

■ Moreover, even if authorized by statute, interest can only be awarded if the damages amount is fixed or easily computed. *First Nat. Bank of Clinton, Ill. v. Insurance Co. of North America*, 606 F.2d 760, 769 (7th Cir.1979); *Cushman & Wakefield of Ill., Inc. v. Northbrook*, 112 Ill. App.3d 951, 68 Ill.Dec. 460, 445 N.E.2d 1313, 1321 (1983); *Central Nat. Chicago Corp. v. Lumbermens Mutual Cas. Co.*, 45 Ill.App.3d 401, 3 Ill.Dec. 938, 359 N.E.2d 797 (1977). This condition could not be met in the case at bar.

We do not believe that the award of interest here can be justified by decisions under federal securities laws, such as *Cant v. A.G. Becker & Co., Inc.*, 379 F.Supp.

972, *modified*, 384 F.Supp. 814 (N.D.Ill. 1974), cited by the district court. We are dealing here with a question of Illinois law and can obtain little, if any, help from federal decisions under federal laws reflecting national policies in the regulation of securities transactions.

### 7b.

■ We conclude, however, that the district court was entirely correct in awarding interest because of the express agreement of the parties.

The Stock Purchase Agreement (PX 1) provides (Section 6.2) that the Sellers "shall indemnify" plaintiff and Universal "against and hold them harmless from: (i) any and all liabilities, obligations, losses, damages, and deficiencies resulting from or arising out of any inaccuracy in or breach of any representation or warranty made by the Sellers in this Agreement or pursuant hereto, and (ii) any and all costs and expenses … relating to the foregoing".

This language seems broad in the extreme and sufficient to encompass interest actually paid on money borrowed from a bank to pay the purchase price, to the extent of the overpayment damages found by the jury to have been $1,300,000 and to have been caused by the breach of warranty of defendants. The interest was part of the "losses" and "damages" and "costs" and "expenses" which resulted from and related to the representations and warranties of the Sellers. The fact that the words "out-of-pocket interest paid" or "pre-judgment interest" do not specifically appear in the Agreement does not seem to us to be significant. A draftsman would not have attempted to enumerate each of the many "losses", "damages", "costs" and "expenses" intended to be covered. Their application was left to the future and we believe that the words include interest actually paid by plaintiff to a bank in the normal course of business on the amount of overpayment caused by a breach of warranty.

■ The court below, however, while relying on the indemnity agreement, did not

find plaintiff entitled to recover what was actually paid by it as interest on the $1,300,000 borrowed overpayment. This actual interest paid was at 8.5% until July 1, 1978, and thereafter to May 20, 1983, was at rates ranging from 9.5% to 20.5% (PX 71). The court below was influenced by *Cant v. A.G. Becker & Co., Inc.*, 379 F.Supp. 972 (N.D.Ill.1974) where (then District) Judge Bauer found "that Section 3 of Chapter 74 of the Illinois Revised Statutes provides a guide for the appropriate interest rate in the instant action". The court below "awarded interest as shown in Section 3 of Chapter 74 of the Illinois Revised Statutes". But the *Cant* case involved federal securities laws, there was no federal prejudgment interest statute, and there was no agreement between the parties.

Section 3 of Chapter 74 of the Illinois Revised Statutes (now Section 2–1303 of Chapter 110 of those Statutes) deals with postjudgment interest—interest on a judgment *after* the judgment has been entered. The rates in this statute were 8% from December 30, 1977, until December 31, 1979, and 9% from January 1, 1980, until May 20, 1983. Those rates were used in the calculation of the $604,446 interest awarded below. Those rates are quite a bit lower than the rates actually paid by plaintiff.

If plaintiff was entitled to its interest expense under the indemnity agreement, as we believe it was, then it is difficult to see why plaintiff should not recover its actual damages in this respect—namely, the interest it actually paid on the $1.3 million overpayment. However, we need not concern ourselves with the correction of any error in this respect because neither party has asked us to do so.

There has been no cross-appeal by plaintiff and plaintiff "accepts here" the interest award as calculated by the district court (Brief of Plaintiff-Appellee, p. 48 fn. 7).

There is no argument for defendants that the district court should have awarded plaintiff its actual interest damages; this is understandable because actual interest damages were significantly higher than the sum fixed by the district court. The only argument for defendants as to the *amount* of interest is (Brief for Defendants-Appellants, pp. 42–43) that the pre-judgment interest statute (*Ill.Rev.Stat.* ch. 17, § 6402) rate of 5% should have been used. As already stated, we are satisfied that this statute does not authorize any award of interest in this case.

### 7c.

We have considered the argument for appellants (Brief, pp. 38, 39) that interest may not be claimed by plaintiff as "damages" or "losses" or "costs" or "expenses" under the indemnity agreement. Appellants argue that plaintiff's only remedy under that agreement for breach of warranty is for reimbursement for payments of claims made by third parties, this because "indemnity" is only a right "to be compensated for loss resulting from legal action taken against him or her by another". We see no merit in the argument.

The meaning of the words "indemnify" and "indemnity" in no way limit them to claims of third parties. The first meaning given for "indemnify" in Webster's New Third International Dictionary (p. 1147) is "to secure or protect against hurt or loss or damage". The first meaning given in the same Dictionary (p. 1147) for "indemnity" is "security or protection against hurt or loss or damage".

The American Law Institute, Restatement of the Law of Security (1941), ch. 3, § 82, comment 1 (p. 236) to "indemnity" states: "A contract of indemnity is one where the promisor agrees to save a promisee harmless from some loss, irrespective of the liability of a third person". While "indemnity" is a term broad enough to *include* protection against claims against the promisee by a third damage.

We are cited by appellants to no authority for limiting the indemnity agreement here to claims made by third persons. Our own research has found no such authority.

The judgment and order from which this appeal is taken are AFFIRMED.