**BLITZ TELECOM CONSULTING, LLC, Plaintiff/Counter–Defendant,**

**v.**

**PEERLESS NETWORK, INC., Defendant/Counter–Plaintiff.**

Case No: 6:14–cv–307–Orl–40GJK

United States District Court,
M.D. Florida,
**Orlando Division.**

Signed August 5, 2016

Lee W. Marcus, Ernest J. Myers, Marcus & Myers, PA, Stephen Michael Jones, The Stephen M. Jones Law Firm, PLLC, Orlando, FL, Tammy G. Cohen, David S. Sellman, SellmanHoff, LLC, Baltimore, MD, James Christopher Falvey, Eckert, Seamans, Cherin & Mellott, LLC, Washington, DC, for Plaintiff/Counter–Defendant.

Henry T. Kelly, Matthew Charles Luzadder, Michael R. Dover, Kelley, Drye & Warren LLP, Chicago, IL, Ronnie J. Bitman, Karl E. Pearson, Pearson Bitman, LLP, Maitland, FL, for Defendant/Counter–Plaintiff.

## ORDER

PAUL G. BYRON, UNITED STATES DISTRICT JUDGE

■ This cause comes before the Court on Plaintiff's Motion to Amend Final Judgment (Doc. 254), filed April 8, 2016. On April 22, 2016, Defendant responded in opposition. (Doc. 262). Upon consideration, Plaintiff's motion will be granted and Plaintiff's judgment will be amended to include $295,520.97 in prejudgment interest.

## I. BACKGROUND

This lawsuit involves a contract dispute between Plaintiff/Counter–Defendant, Blitz Telecom Consulting, LLC ("Blitz"), and Defendant/Counter–Plaintiff, Peerless Network, Inc. ("Peerless"), over Peerless's nonpayment of commissions owed to Blitz for telecommunications traffic Blitz placed

on Peerless's networks. On November 9, 2010, the parties entered into an IP Control Agreement (the "Contract")[1] whereby Peerless agreed to assign telephone numbers to Blitz for a fee. The Contract contemplated that Blitz would then use these numbers to place traffic on Peerless's networks. In exchange, Peerless agreed to pay a 30% commission to Blitz each month based on certain revenues Peerless collected on the traffic Blitz placed on its networks. This commission, referred to as the "co-marketing fee," forms the epicenter of the parties' dispute.

From the Contract's inception in November 2010 through June 2012, Peerless accounted for and paid monthly co-marketing fees to Blitz. However, on April 11, 2012, Peerless notified Blitz by mail that it would no longer remit co-marketing fees to Blitz because of an order entered by a Texas federal district court in *Southwestern Bell Telephone Co. v. IDT Telecom, Inc.*, No. 3:09–CV–01268–P (N.D. Tex. Mar. 9, 2012) (hereinafter referred to as the "*IDT* Decision"). In its letter to Blitz, Peerless asserted that it was entitled to modify the Contract under a clause which provided, in pertinent part, that the parties could renegotiate the terms of their agreement should any change in law materially affect the ability of either party to perform their contractual obligations. It was Peerless's position that the *IDT* Decision constituted such a change in law. As a result, Peerless informed Blitz that it would no longer pay co-marketing fees to Blitz because of the *IDT* Decision. In subsequent communications between the parties, Peerless also stated that it would not collect revenues on Blitz's traffic either.

Unbeknownst to Blitz, and despite Peerless's representations to the contrary, Peerless continued to collect revenues on Blitz's traffic. When Blitz discovered Peerless's conduct in October 2013, Blitz demanded a full accounting of the revenues Peerless had collected. Peerless refused, however, claiming that it had modified the Contract due to the *IDT* Decision and was no longer obligated to pay Blitz a co-marketing fee for traffic placed on Peerless's networks, regardless of whether Peerless was or was not collecting revenues on that traffic. This lawsuit ensued.

In its Complaint, Blitz sought to recover the value of co-marketing fees to which it believed it was legally entitled. Blitz alleged claims for breach of contract and quantum meruit, and additionally sought a number of declarations from the Court to resolve the parties' rights and obligations relative to the Contract. On summary judgment, the Court granted one such declaration and held that the *IDT* Decision did not constitute a change in law and did not authorize Peerless to renegotiate or modify the Contract. Peerless also countersued Blitz to recover certain allegedly unpaid charges associated with the services it provided to Blitz under the Contract.

This matter proceeded to a jury trial beginning on March 2, 2016. On March 9, 2016, the jury returned a verdict finding that Peerless breached the Contract and a subsequent modification to the Contract by failing to pay co-marketing fees to Blitz. The jury determined that Peerless's breach caused Blitz $2,347,704.43 in damages. The jury also found in favor of Blitz on both of Peerless's counterclaims. The Court thereafter entered judgment according to the jury's verdict. Blitz now moves to amend that judgment to include an award of prejudgment interest.[2]

---

1. The Contract was admitted into evidence at trial as Plaintiff's Exhibit 159.

2. On April 11, 2016, Peerless appealed from the judgment which Blitz seeks to amend. This Court retains jurisdiction to resolve

## II. DISCUSSION

As an initial matter, the parties disagree as to which state's law applies to Blitz's request for prejudgment interest. Because this Court sits in diversity, the law of the forum state, Florida, conceivably applies. However, the Contract through which Blitz prevailed contains a choice of law provision which mandates that Illinois law governs. Blitz represents that it is not certain whether Florida law or Illinois law controls the award of prejudgment interest and makes its case under both. On the other hand, Peerless maintains that the Contract's choice of law clause, and therefore Illinois law, must resolve the issue. The Court is therefore tasked in the first instance with ascertaining the applicable law, upon which the Court will then turn to whether Blitz is entitled to prejudgment interest and, if so, how much.

### A. Whether Florida or Illinois Law Applies

 A federal court exercising diversity jurisdiction must perform a two-step inquiry to determine the applicable law. *Allstate Ins. Co. v. Stanley*, 282 F.Supp.2d 1342, 1343 (M.D. Fla. 2003). First, the court must ask whether the issue in dispute is substantive or procedural under *Erie Railroad Co. v. Tompkins. Id.* If the issue is procedural, federal procedural law applies and the inquiry ends. *Id.* If the issue is substantive, the court must then look to the forum state's choice of law rules and ask whether the forum state's law or the law of some other jurisdiction applies. *Md. Cas. Co. v. Williams*, 377 F.2d 389, 393 n.1 (5th Cir. 1967).[3] This second inquiry requires the court to again charac-

terize the issue as substantive or procedural according to the forum state's choice of law rules. *Id.* Where the forum state views the issue as substantive, the court must apply the substantive law as dictated by the forum state's choice of law rules. *Id.* Where the forum state views the issue as procedural, the court must apply the forum state's procedural law. *Id.; see also Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496–97, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941) (explaining the significance of recognizing the distinction between substance and procedure under the forum state's choice of law rules). Importantly, each step of this two-step inquiry is independent of the other; whether an issue is substantive for *Erie* purposes does not answer the second question of whether the issue is substantive according to the forum state for choice of law purposes and vice versa. *Williams*, 377 F.2d at 393 n.1.

 Here, the first step of the inquiry is easy, as it is well-settled that prejudgment interest is substantive for *Erie* purposes. *Schwan's Sales Enters., Inc. v. SIG Pack, Inc.*, 476 F.3d 594, 595 (8th Cir. 2007). The Court will therefore look to the choice of law rules of the forum state, Florida, to identify the source of law which governs Blitz's claim to prejudgment interest. In doing so, the Court must next characterize the issue of prejudgment interest as either substantive or procedural according to Florida law. If Florida views prejudgment interest as substantive, then the parties' contractual agreement to be bound by Illinois substantive law controls because Florida courts enforce valid choice of law clauses such as the clause involved in this case. *See Mazzoni Farms, Inc. v.*

---

Blitz's motion to amend the judgment notwithstanding Peerless's notice of appeal, which will not become effective until the date of this Order. *See Stansell v. Revolutionary Armed Forces of Colom.*, 771 F.3d 713, 745–46 (11th Cir. 2014).

**3.** In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all of the decisions of the former Fifth Circuit that were handed down prior to October 1, 1981.

*E.I. DuPont De Nemours & Co.*, 761 So.2d 306, 311 (Fla. 2000). However, if Florida views prejudgment interest as procedural, then Florida procedural law controls. *See Williams*, 377 F.2d at 393 n.1.

Blitz contends that prejudgment interest in Florida is likely procedural. Blitz describes the award of prejudgment interest as a purely ministerial function which requires the trial court to do nothing more than calculate the amount of prejudgment interest due when entering judgment. Conversely, Peerless argues that prejudgment interest in Florida is substantive, as prejudgment interest forms a part of a plaintiff's substantive claims and remedies. Both parties acknowledge that there is no case law directly commenting on how Florida courts characterize the award of prejudgment interest. This Court is therefore called to answer the question as a matter of first impression.

The Florida Supreme Court has provided ample guidance in deciphering whether an issue is substantive or procedural under Florida law:

Substantive law has been defined as that part of the law which creates, defines, and regulates rights, or that part of the law which courts are established to administer. It includes those rules and principles which fix and declare the primary rights of individuals with respect towards their persons and property. On the other hand, practice and procedure encompass the course, form, manner, means, method, mode, order, process or steps by which a party enforces substantive rights or obtains redress for their invasion. Practice and procedure may be described as the machinery of the judicial process as opposed to the product thereof. It is the method of conducting litigation involving rights and corresponding defenses.

*Se. Floating Docks, Inc. v. Auto–Owners Ins. Co.*, 82 So.3d 73, 78 (Fla. 2012) (quoting *Massey v. David*, 979 So.2d 931, 936–37 (Fla. 2008)) (emphases and internal quotation marks omitted). Of course, the line between substance and procedure is not always clear, and a particular issue may involve both substantive and procedural aspects. *Massey*, 979 So.2d at 937; *see also, e.g., De Varona v. Discount Auto Parts, LLC*, 935 F.Supp.2d 1335, 1343 (S.D. Fla. 2013) (observing that Florida's offer of judgment statute contains both substantive and procedural components). Nevertheless, an issue is ultimately substantive where it creates a right or remedy and the procedural aspects of the issue are merely incidental to that right or remedy. *See Massey*, 979 So.2d at 937.

Florida adheres to the "loss theory" of prejudgment interest. *Bosem v. Musa Holdings, Inc.*, 46 So.3d 42, 45 (Fla. 2010) (per curiam). Under this theory, Florida courts award prejudgment interest as an element of damages to fully compensate the plaintiff for the value of his or her loss which was caused by the defendant's conduct. *Argonaut Ins. Co. v. May Plumbing Co.*, 474 So.2d 212, 214–15 (Fla. 1985). Neither the defendant's good faith in defending against the lawsuit nor the plaintiff's inability to quantify the value of loss preclude an award of prejudgment interest; the plaintiff shall recover prejudgment interest as a matter of right once a finder of fact determines that the defendant is liable and reduces the plaintiff's injuries to a sum certain. *Id.* at 215. While equitable considerations or certain types of injuries may preclude an award of prejudgment interest in a particular case, prejudgment interest is generally mandatory and is available in any dispute where the plaintiff's loss is pecuniary in nature, including those grounded in contract, *see, e.g., Summerton v. Mamele*, 711 So.2d 131, 133 (Fla. Dist. Ct. App. 1998) (awarding prejudgment interest for breach of construction contract), tort, *see, e.g., Specialty*

*Marine & Indus. Supplies, Inc. v. Venus*, 66 So.3d 306, 311–12 (Fla. Dist. Ct. App. 2011) (awarding prejudgment interest on negligent misrepresentation claim), or property rights, *see, e.g., Pace Prop. Fin. Auth., Inc. v. Jones*, 24 So.3d 1271, 1272 (Fla. Dist. Ct. App. 2009) (awarding prejudgment interest for trespass which resulted in damage to trees and vegetation).

Because prejudgment interest comprises a portion of a plaintiff's recovery under Florida law, it is a substantive right. While Blitz is correct that the calculation of prejudgment interest is the subject of a statutory procedure, *see* Fla. Stat. §§ 55.03, 687.01, the award of prejudgment interest itself is a substantive remedy. The procedural calculation of prejudgment interest is merely incidental to the substantive right. As a result, the parties' contractual agreement to be bound by Illinois law controls Blitz's request for prejudgment interest in this case.

### B. Whether Blitz is Entitled to Recover Prejudgment Interest Under Illinois Law

In Illinois, "prejudgment interest is recoverable only where authorized by the agreement of the parties or by statute." *Kouzoukas v. Ret. Bd. of Policemen's Annuity & Benefit Fund of Chicago*, 234 Ill.2d 446, 334 Ill.Dec. 924, 917 N.E.2d 999, 1015 (2009). Blitz does not contend that the Contract in this case provides for an award of prejudgment interest. Rather, Blitz bases its claim to prejudgment interest on the Illinois Interest Act (the "Interest Act"), which awards prejudgment interest under five circumstances:

> Creditors shall be allowed to receive at the rate of five (5) per centum per annum for [1] all moneys after they become due on any bond, bill, promissory note, or other instrument of writing; [2] on money lent or advanced for the use of another; [3] on money due on the settle-

ment of account from the day of liquidating accounts between the parties and ascertaining the balance; [4] on money received to the use of another and retained without the owner's knowledge; and [5] on money withheld by an unreasonable and vexatious delay of payment.

815 Ill. Comp. Stat. 205/2. The purpose of awarding prejudgment interest under the Interest Act is to make the injured plaintiff whole by compensating for the lost time-value of money which was properly due. *See Platinum Tech., Inc. v. Fed. Ins. Co.*, 282 F.3d 927, 933 (7th Cir. 2002).

Blitz submits that it is entitled to prejudgment interest under the Interest Act for a number of reasons, only two of which the Court will discuss in this Order. First, Blitz maintains that the Contract is an instrument of writing upon which money is due. Second, Blitz asserts that the facts of this case demonstrate that Peerless unreasonably and vexatiously delayed payment of co-marketing fees. The Court examines these two grounds for prejudgment interest in turn.

#### 1. Moneys Due on an Instrument of Writing

The first provision of the Interest Act through which Blitz seeks relief awards prejudgment interest for all moneys after they become due on any instrument of writing. To demonstrate entitlement to prejudgment interest under this provision, a plaintiff must establish three elements: (1) the existence of a written instrument which creates a debtor-creditor relationship between the plaintiff and the defendant, (2) the written instrument establishes a specific or inherent due date for the payment of moneys owed, and (3) the moneys owed are reasonably ascertainable. *PPM Fin., Inc. v. Norandal USA, Inc.*, 392 F.3d 889, 895 (7th Cir. 2004). When all three elements are present, an award of prejudgment interest is mandato-

ry. *Milligan v. Gorman*, 348 Ill.App.3d 411, 284 Ill.Dec. 747, 810 N.E.2d 537, 541 (2004). Peerless does not dispute that the Contract contains a specific or inherent due date for the payment of co-marketing fees. Rather, Peerless challenges Blitz's claim to prejudgment interest on the grounds that the Contract does not create a debtor-creditor relationship and that the co-marketing fees owed to Blitz under the Contract were not reasonably ascertainable.

### a. The Contract Creates a Debtor–Creditor Relationship

 For purposes of the Interest Act, a debtor-creditor relationship arises when a contract reflects transactions of a business or commercial nature such that one party to the contract owes money to the other for the performance thereof. *See Kouzoukas*, 334 Ill.Dec. 924, 917 N.E.2d at 1017. Illinois courts construe the debtor-creditor relationship requirement broadly and have found the relationship to arise in a wide array of written instruments. *See, e.g., Certain Underwriters at Lloyd's, London v. Abbott Labs.*, 384 Ill.Dec. 354, 16 N.E.3d 747, 762 (Ill. App. Ct. 2014) (holding that an insurance policy creates a debtor-creditor relationship); *Thoms–Proestler Co. v. Knockouts Sports Bar & Grill, Inc.*, No. 3–10–0657, 2011 WL 10469841, at *4 (Ill. App. Ct. 2011) (finding that invoices created debtor-creditor relationship); *Milligan*, 284 Ill.Dec. 747, 810 N.E.2d at 542 (finding settlement agreement to create a debtor-creditor relationship); *R.W. Dunteman Co. v. Vill. of Lombard*, 281 Ill. App.3d 929, 217 Ill.Dec. 93, 666 N.E.2d 762, 768 (1996) (holding that construction contracts create a debtor-creditor relationship).

Peerless asserts that the Contract does not create a debtor-creditor relationship because the Contract does not fully represent the parties' agreement regarding the payment of co-marketing fees. Peerless contends that the Contract was subsequently modified by email and through the parties' course of performance to include other types of telecommunications traffic in the calculation of Blitz's co-marketing fee. Peerless reasons that it is this subsequent, unwritten modification which embodies the parties' debtor-creditor relationship, not the Contract, thus precluding an award of prejudgment interest under the Interest Act's written instrument provision.

The Court finds Peerless's position untenable. The Interest Act only requires that a written instrument *create* a debtor-creditor relationship, not that it embody the most recent terms of that relationship. This concept of creation is underscored by case law interpreting the Interest Act. *See, e.g., First Nat'l Bank of LaGrange v. Lowrey*, 375 Ill.App.3d 181, 313 Ill.Dec. 464, 872 N.E.2d 447, 479 (2007) ("To recover prejudgment interest under the [Interest] Act, there must be … a debtor-creditor relationship that has *come into existence* by virtue of a written instrument.") (emphasis added); *Adams v. Am. Int'l Grp., Inc.*, 339 Ill.App.3d 669, 274 Ill.Dec. 230, 791 N.E.2d 26, 30 (2003) ("[T]he written instrument must *establish* a debtor/creditor relationship.") (emphasis added); *Krantz v. Chessick*, 282 Ill.App.3d 322, 217 Ill.Dec. 892, 668 N.E.2d 77, 80 (1996) ("An instrument in writing within the meaning of the [Interest Act] is one that *sets up* a creditor-debtor relationship.") (emphasis added); *Advance Mortg. Corp. v. Concordia Mut. Life Ass'n*, 135 Ill.App.3d 477, 90 Ill.Dec. 225, 481 N.E.2d 1025, 1031–32 (1985) (awarding prejudgment interest where written instruments *"brought into being the existence of* a debtor-creditor relationship") (emphasis added). Peerless cites, and the Court has encountered, no authority to support the notion that the Interest Act demands more than the mere creation of a debtor-creditor relationship,

and the Court will not read into the Interest Act that which is not there. *See Bassett v. Pekin Police Pension Bd.*, 362 Ill. App.3d 235, 298 Ill.Dec. 143, 839 N.E.2d 130, 136 (2005) ("[I]nterest statutes are to be strictly construed; nothing will be read into them by intendment or implication.").

When Peerless's argument is read carefully, Peerless actually does not dispute that the Contract created a debtor-creditor relationship between it and Blitz. Indeed, the Contract required Blitz to use telephone numbers assigned by Peerless to place telecommunications traffic on Peerless's networks. (Contract §§ 3.5, 7.4). In exchange, Peerless agreed to pay a 30% commission based on the volume of traffic Blitz placed on its networks. (Contract App. A § 1.1). Illinois courts have long found such an agreement to pay commissions based on another party's performance to establish the requisite debtor-creditor relationship. *See, e.g., Boland Managed Servs., Inc. v. Coral Chem. Co.*, No. 4–12–0563, 2013 WL 1787814, at *15 (Ill. App. Ct. Apr. 24, 2013) (finding that a marketing agreement which paid commission to independent sales consultant created a debtor-creditor relationship); *Emerich v. Leviton*, 117 Ill.App.3d 832, 73 Ill. Dec. 301, 454 N.E.2d 45, 48 (1983) (finding that real estate contract promising to pay $10,000 closing commission to broker created debtor-creditor relationship); *Tech. Representatives, Inc. v. Richardson–Merrell, Inc.*, 107 Ill.App.3d 830, 63 Ill.Dec. 668, 438 N.E.2d 599, 602–03 (1982) (finding that manufacturer's agreement to pay 7% commission to sales representative established a debtor-creditor relationship).

Instead, Peerless's real argument is that the nature of this debtor-creditor relationship changed by virtue of the parties' subsequent modification. However, absent a modification which terminated their debtor-creditor relationship—an argument Peerless does not make—a change in the terms of the debtor-creditor relationship has no effect on whether the Contract created a debtor-creditor relationship in the first place. Because all the Interest Act requires is the creation of a debtor-creditor relationship, and because the Contract in this case clearly creates such a relationship, the Contract remains within the scope of the Interest Act's written instrument provision.

### b. The Co–Marketing Fees Were Reasonably Ascertainable

 To award prejudgment interest, the Interest Act's written instrument provision additionally requires that the amount due on a written instrument be reasonably ascertainable in that the amount due is either fixed or subject to easy computation. *N.H. Ins. Co. v. Hanover Ins. Co.*, 296 Ill.App.3d 701, 231 Ill. Dec. 293, 696 N.E.2d 22, 28 (1998). An amount is not fixed or subject to easy computation if it can only be obtained through the fact-finder's opinion or judgment of its value. *Zayre Corp. v. S.M. & R. Co.*, 882 F.2d 1145, 1157 (7th Cir. 1989). However, where the written instrument either states the amount due on its face or "contains a formula from which that amount can be computed with reasonable accuracy," prejudgment interest is properly awarded. *Residential Mktg. Grp., Inc. v. Granite Inv. Grp.*, 933 F.2d 546, 549 (7th Cir. 1991).

Peerless maintains that the value of co-marketing fees Blitz sought under the Contract was not subject to easy computation. Peerless points to the fact that Blitz introduced two different calculations of the unpaid co-marketing fees at trial and that it was not until the jury exercised its judgment in determining the correct calculation that the amount due finally became ascertainable. Peerless additionally points to the testimony of Blitz's damages witness who testified that his calculations were

only estimates of the co-marketing fees due. Peerless therefore concludes that the amount of co-marketing fees was neither fixed nor subject to easy computation under the Contract.

The Court again finds Peerless's argument unpersuasive. The Contract requires that "Peerless will pay a co-marketing fee at the stated commission structure of 30% to [Blitz] based on collected revenues on InterLata CABS (carrier access billing) charges for Interstate and Intrastate traffic terminating to or associated with the local telephone numbers comprising a component of the Service provided to [Blitz]." (Contract App. A § 1.1). The Contract was later modified to require Peerless to "pay[ ] Blitz commission on ALL collected revenue for ALL Blitz traffic at 30% regardless of traffic type or Jurisdiction." (Pl.'s Ex. 199). In either case, all anyone would have to do to calculate the amount of co-marketing fees Peerless owed to Blitz would be to obtain the total revenues collected based on the relevant traffic type and multiply that amount by 30%. Both the original Contract and the parties' subsequent modification therefore provide an easy to follow formula for calculating co-marketing fees.

The two cases which Peerless cites to support its argument that the co-marketing fees were not subject to easy computation are easily distinguishable from the facts of this case.[4] Peerless's first case is *Cushman & Wakefield of Illinois, Inc. v. Northbrook 500 Ltd. Partnership*, in which the plaintiff sued the defendants to recover leasing commissions owed pursuant to a renting agency agreement. 112 Ill.App.3d 951, 68 Ill.Dec. 460, 445 N.E.2d 1313, 1314 (1983). Although the plaintiff ultimately prevailed at trial, the court declined to award prejudgment interest under the Interest Act. *Id.* On review, the appellate court agreed that prejudgment interest was inappropriate because the value of the plaintiff's leasing commissions was subject to a complex formula which involved consideration of myriad factors, including the amount of rent for each rental unit, the length of each lease, the identity of the broker who procured each lease, any "step-ups" or "step-downs" in rent across each lease period, and any rental abatements applied to a lease. *See id.*, 68 Ill. Dec. 460, 445 N.E.2d at 1315–16, 1321. The second case relied on by Peerless is *Empire Gas Corp. v. American Bakeries Co.*, where the plaintiff sued the defendant for breaching a requirements contract for the purchase of propane. 840 F.2d 1333, 1335 (7th Cir. 1988). The plaintiff prevailed at trial and the trial court awarded prejudgment interest under the Interest Act. *Id.* On appeal, however, the Seventh Circuit reversed the award of prejudgment interest, reasoning that the amount of damages incurred by the plaintiff under the requirements contract was not reasonably ascertainable because the value of the plaintiff's total loss involved uncertainties which could only be resolved through the jury's judgment, such as the defendant's exact propane requirements during the contract's term and the plaintiff's lost profits caused by the defendant's breach. *Id.* at 1342.

Unlike the renting agency agreement in *Cushman & Wakefield*, the Contract in this case does not employ a complex formula encompassing numerous factors and adjustments to calculate the amount of co-marketing fees. And unlike the require-

---

**4.** Peerless cites a third case in support of its argument on this point: *Kay v. Prolix Packaging, Inc.*, 373 Ill.Dec. 39, 993 N.E.2d 39 (Ill. App. Ct. 2013). However, *Kay* is inapposite because it only discusses prejudgment interest in the context of whether the defendant had a good faith basis for refusing to pay the amounts allegedly owed, not whether the amounts owed were subject to easy computation. *See id.*, 373 Ill.Dec. 39, 993 N.E.2d at 50.

ments contract in *Empire Gas*, the value of Blitz's damages caused by Peerless's breach does not involve uncertainties that could have only been resolved by the jury. To the contrary, the face of Peerless and Blitz's Contract and the terms of the subsequent modification describe a simple, one-step formula for ascertaining the amount of co-marketing fees owed:

*Collected Revenues* (\$) × 30% = *Co–Marketing Fee* (\$)

Indeed, Peerless's position is belied by the fact that it tendered numerous timely payments of co-marketing fees to Blitz under the Contract, both before and after the parties' modification, thus indicating that Peerless easily calculated the amount of co-marketing fees it owed under the pertinent formula. Specifically, Blitz produced at trial several commission reports prepared by Peerless for Blitz in which Peerless calculated the amount of co-marketing fees it owed. (Pl.'s Exs. 180, 182, 189, 200, 208, 209, 217, 219, 220). These commission reports employed the same basic formula required by the Contract to calculate co-marketing fees. (*See* Doc. 272, 77:9–86:8, 87:3–93:25). Moreover, at no point during its performance of the Contract did Peerless complain that it experienced difficulties calculating the amount of co-marketing fees owed to Blitz.

To the extent Peerless views Blitz's presentation of two different calculations of estimated co-marketing fees to the jury as an indication that the co-marketing fees were not subject to easy computation, Peerless's argument is disingenuous. The Contract required Peerless to provide Blitz with an accounting each month of all traffic on which it collected revenues in order to calculate the co-marketing fee owed to Blitz for that month. (Contract App. A § 4). The evidence at trial established that Peerless provided this accounting without issue during the Contract's performance. (*See* Pl.'s Exs. 180, 182, 189, 200, 208, 209, 217, 219, 220). Once Peerless breached the Contract, however, it stopped supplying Blitz with the monthly accountings, despite the fact that Peerless secretly continued to collect revenues on Blitz's traffic. When Blitz learned of Peerless's actions, Blitz ardently pursued the information it needed to calculate the value of co-marketing fees Peerless owed under the Contract. (Pl.'s Exs. 434, 547, 551). There is no dispute that Peerless was always in possession of this information. Nevertheless, Peerless blocked Blitz from obtaining this information every step of the way, so much so that the Court was forced to compel Peerless to produce the accountings and impose sanctions for Peerless's delay. (Docs. 129, 205). When Peerless finally did divulge the information Blitz sought, it did so by producing two different sets of accounting reports. The first set calculated co-marketing fees based on the assumption that Peerless collected revenues on all of Blitz's traffic. (Doc. 274, 232:22–234:2). The second set excluded traffic from certain carriers who had not paid Peerless due to billing disputes. (*Id.* at 292:23–295:23). As a result, the second set of reports showed a lower value of co-marketing fees owed to Blitz. At the time Peerless produced the two sets of reports, Peerless represented that it could not say for sure which set it would have relied on to calculate the co-marketing fees owed to Blitz had the Contract remained in effect. (*See* Doc. 174, pp. 11–16). Accordingly, Blitz constructed alternative damage calculations using each set of reports. (*See* Doc. 272, 70:14–126:17; Pl.'s Ex. 429, pp. 1, 12).

In sum, the only reason Blitz presented two separate co-marketing fee estimates to the jury was because Peerless breached the Contract, withheld the information necessary to calculate the exact value of fees owed, and refused to identify which set of reports it would have relied on had the parties fully performed their obli-

gations. Peerless does not get to benefit from its intransigence. The fact remains that the Contract provided a clear and precise formula for accurately calculating the amount of co-marketing fees Peerless owed to Blitz. Had Peerless not breached the Contract and provided Blitz with the required monthly accountings, the co-marketing fees would have been subject to easy computation, just as they had been prior to Peerless's breach. For these reasons, the Court finds that the Contract is an instrument of writing within the purview of the Interest Act. The Court must therefore award prejudgment interest to Blitz.

### 2. Money Withheld by an Unreasonable and Vexatious Delay of Payment

Alternatively, the Court also finds that Blitz is entitled to prejudgment interest pursuant to the Interest Act's unreasonable and vexatious delay of payment provision. In order to recover prejudgment interest under this provision, "the claimant must show that his opponent has thrown obstacles in the way of collection or has otherwise induced the [claimant] to delay collection proceedings." *Pietka v. Chelco Corp.*, 107 Ill.App.3d 544, 63 Ill.Dec. 223, 437 N.E.2d 872, 883 (1982); *see also United States ex. rel. Treat Bros. Co. v. Fid. & Deposit Co.*, 986 F.2d 1110, 1121 (7th Cir. 1993) ("[C]onduct tantamount to fraud, hindrances to payment collection, or other bad faith inducements designed to delay collection, are considered to be unreasonable delays."). However, "[n]either an honest dispute regarding the existence of a legal obligation nor the defense of a lawsuit can be regarded as unreasonable and vexatious delays in payment." *Pietka*, 63 Ill.Dec. 223, 437 N.E.2d at 883. Whether payment has been unreasonably and vexatiously delayed depends on the facts of each case. *Hamilton v. Am. Gage & Mach. Corp.*, 35 Ill.App.3d 845, 342 N.E.2d 758, 766 (Ill. App. Ct. 1976).

Peerless claims that it had a legitimate and honest dispute regarding the payment of co-marketing fees to Blitz and has always acted in good faith in defending its perception of its legal duties under the Contract. Specifically, Peerless asserts that it honestly believed that the *IDT* Decision represented a change in law 'according to the Contract's terms and thus authorized Peerless to unilaterally modify the Contract to terminate the payment of co-marketing fees. Peerless maintains that it should not be punished simply because it happened to be wrong.

The Court disagrees. Peerless's actions prior to litigation are emblematic of the obstacles and bad faith inducements which warrant an award of prejudgment interest for the unreasonable and vexatious delay of payment. First, no fair interpretation of the *IDT* Decision could lead to the conclusion that the *IDT* Decision affected any right or obligation of Peerless to pay co-marketing fees under the Contract. As the Court explained in its resolution of the parties' motions for summary judgment, the *IDT* Decision was rendered by a Texas federal district court which only had authority to resolve the legal issues of the parties before it, none of which were Blitz or Peerless. *Blitz Telecom Consulting, LLC v. Peerless Network, Inc.*, 151 F.Supp.3d 1294, 1302 (M.D. Fla. 2015). The *IDT* Decision additionally had no impact on Peerless's obligation to pay co-marketing fees to Blitz under the Contract. *Id.* at 1305. Further, Blitz introduced evidence at trial demonstrating that Peerless only used the *IDT* Decision as a guise for breaching the Contract so Peerless could charge higher rates on the traffic covered by the Contract in a new agreement. (*See* Doc. 271, 60:13–63:22; Pl.'s Ex. 3). The Court therefore finds that Peerless's interpretation of the *IDT* Decision was not the result of an honest or good faith dispute

regarding its contractual obligations under the Contract.

Second, even assuming that Peerless's misinterpretation of the *IDT* Decision was an honest mistake, Peerless's invocation of the Contract's change in law clause to unilaterally modify the Contract clearly was not. That clause provided as follows:

> In the event of (a) any legislative, regulatory, Judical [sic] or other legal action that materially affects the ability of a Party to perform any material obligation under this Agreement, or (b) any FCC rule, or (c) the enactment or amendment to any applicable Commission order or arbitration award purporting to apply the provisions of the Act (individually and collectively "Change in Law"), either Party may, on thirty (30) days' written notice to the other Party ..., require that the affected provision(s) be *renegotiated*, or that new terms be added to this Agreement, if applicable.

(Contract § 23) (emphasis added). By its unambiguous terms, the Contract only permitted renegotiation of the Contract, not unilateral modification. Therefore, even if Peerless had been correct that the *IDT* Decision constituted a change in law according to the terms of the Contract, the only action Peerless could have legally taken was to notify Blitz that it wished to renegotiate its obligation to pay co-marketing fees. However, instead of attempting to renegotiate, Peerless informed Blitz on April 11, 2012 that it was unilaterally modifying the Contract and would no longer pay co-marketing fees:

> The [*IDT* Decision] materially affects the ability of Peerless to perform in paying compensation to you for prepaid calling card traffic. Effective immediately, the [Contract] is modified to reflect the change in law. Please be advised that effective thirty days from the effective date of this notice, there will be no compensation payable to you on prepaid calling card traffic.

(Def.'s Ex. 4). There is no honest, good faith reading of the Contract's change in law provision which would allow Peerless to unilaterally modify the Contract and stop paying co-marketing fees to Blitz.

Peerless's unreasonable and vexatious delay in paying co-marketing fees is further illustrated by its conduct after the purported unilateral modification of the Contract. Despite its numerous representations to Blitz that it was not collecting revenues on Blitz's traffic (*see* Pl.'s Exs. 74, 547, 550, 551), Peerless continued to do so in secret and retained those revenues for itself. Blitz learned of the scheme about one year after Peerless's unilateral modification at a trade show meeting where Peerless's President and CEO, John Barnicle, inadvertently revealed that Peerless was, in fact, collecting revenues on Blitz's traffic. (Doc. 270, 126:23–128:1). Blitz thereafter attempted to confirm with Peerless in writing whether Peerless was collecting revenues, but Peerless refused to answer Blitz's questions. (*Id.* at 128:2–15; Pl.'s Exs. 74, 547, 549). As it turned out, Peerless was indeed collecting revenues on which it was obligated to pay co-marketing fees to Blitz. Finally, as explained in more detail in Section II.B.1.b, *supra*, Peerless hindered Blitz from obtaining the accountings needed to calculate the amount of co-marketing fees Peerless owed. It was not until the Court intervened almost three and a half years after the first delinquent co-marketing fee became due that Blitz finally received these accountings.

The facts of this case lead to the inescapable conclusion that Peerless purposely threw obstacles in the way of Blitz's collection of co-marketing fees rightfully due under the Contract. Peerless's misinterpretation of the *IDT* Decision and its unjustified unilateral modification of the Con-

tract were not honest legal disputes or reasonable mistakes. Perhaps most telling, however, is that Peerless secretly continued to collect revenues on Blitz's traffic, misled Blitz when Blitz discovered the scheme, and thereafter impeded Blitz for years from obtaining the accountings necessary to calculate the amount of co-marketing fees Peerless contractually owed. There is no doubt such conduct embodies the type of obstacles and hindrances to collection which warrant the award of prejudgment interest for unreasonable and vexatious delay of payment. Blitz is therefore entitled to prejudgment interest under that provision of the Interest Act as well.

## C. Calculating Prejudgment Interest

Having found that Blitz is entitled to prejudgment interest under the Interest Act, the Court must next calculate the amount of prejudgment interest Blitz will recover. The Interest Act awards prejudgment interest at the rate of 5% per annum after money owed becomes due. 815 Ill. Comp. Stat. 205/2. The testimony at trial demonstrated that Peerless would generate a commission report sixty days after each monthly billing period, at which time the co-marketing fee for that billing period would become due to Blitz. (Doc. 273, 212:7–17). Although Peerless stopped creating these reports after it breached the Contract, Blitz produced Peerless's calculations of the actual revenues it collected on Blitz's traffic for each billing period from May 2012 through October 2014 which would have formed the basis for commission reports from July 2012 through December 2014 had they been created. (Pl.'s Exs. 409, 542, 456, 509, 484, 445, 522, 504, 540, 486, 470, 519, 533, 531, 537, 528, 541, 477, 446, 475, 472, 455, 468,

518, 495, 440, 508, 494, 520, 500).[5] Each commission report prior to Peerless's breach is dated for the fifth of the month, on which date Blitz's commission became due, and there is no reason in the record to believe that Peerless would have produced commission reports on any other day of the month had it not breached the Contract. Accordingly, prejudgment interest for each billing period begins to accrue on the fifth day of the month in which the corresponding commission report would have been issued.

When prejudgment interest stops accruing under the Interest Act is a different question, and is not adequately briefed by the parties. Although the Interest Act does not demarcate when prejudgment interest stops accruing, Illinois utilizes a second interest statute which does:

> Interest on judgment. Judgments recovered in any court shall draw interest at the rate of 9% per annum from the date of the judgment until satisfied or 6% per annum when the judgment debtor is a unit of local government, ... a school district, a community college district or any other governmental entity. When judgment is entered upon any award, report or verdict, *interest shall be computed at the above rate, from the time when made or rendered to the time of entering judgment upon the same, and included in the judgment.*

735 Ill. Comp. Stat. 5/2–1303 (emphasis added) (hereinafter referred to as "Section 2–1303"). Although this statute is titled "Interest on judgment," the Illinois Supreme Court explains that the language italicized above represents another form of prejudgment interest to be awarded after any award, report, or verdict but before

---

**5.** Plaintiff's Exhibit 409 is Peerless's calculation of projected revenues to be collected on the traffic Blitz placed on its networks for each billing period. The Court then cites Peer-less's calculations of actual revenues collected on that traffic in chronological order based on billing period.

the formal entry of an enforceable judgment:

> This provision ... provides for interest to accrue on awards, reports, and verdicts as well as judgments. Interest that accrues on reports, awards, and verdicts may be viewed as a form of "prejudgment" interest to distinguish it from the interest that accrues on the judgment itself ("post-judgment" interest).

*Ill. State Toll Highway Auth. v. Heritage Standard Bank & Tr. Co.*, 157 Ill.2d 282, 193 Ill.Dec. 180, 626 N.E.2d 213, 221 n.1 (1993); *see also Eclipse Mfg. Co. v. U.S. Compliance Co.*, 381 Ill.App.3d 127, 319 Ill.Dec. 586, 886 N.E.2d 349, 361 (2007) (awarding prejudgment interest under Section 2–1303 and observing that reference to Section 2–1303 as a "post-judgment" interest statute is "inaccurate"). The purpose of providing this second type of prejudgment interest where an enforceable judgment has not yet been entered is "to make the judgment creditor 'whole,' by requiring the judgment debtor to give up the use of the money and thereby allow the creditor to use the funds to earn interest if he so chooses while the matter is pending." *Halloran v. Dickerson*, 287 Ill. App.3d 857, 223 Ill.Dec. 323, 679 N.E.2d 774, 780 (1997). The judgment debtor can stop the accrual of prejudgment interest under Section 2–1303 by tendering the full value of the report, award, or verdict to the judgment creditor at the time the report, award, or verdict is rendered. *Id.*, 223 Ill.Dec. 323, 679 N.E.2d at 778. The award of interest under Section 2–1303 is mandatory. *Longo v. Globe Auto Recycling, Inc.*, 318 Ill.App.3d 1028, 252 Ill.Dec. 799, 743 N.E.2d 667, 675–76 (2001).

When read together in the context of this case, the Interest Act requires prejudgment interest to accrue at the rate of 5% per annum until the date of the jury's verdict on March 9, 2016, at which time prejudgment interest under Section 2–1303 accrues at the rate of 9% per annum until the Court's entry of judgment on March 11, 2016. The Court will compute prejudgment interest separately under each statutory provision and thereafter include the sum of the two within the judgment. *See Harrington v. Kay*, 136 Ill.App.3d 561, 91 Ill.Dec. 214, 483 N.E.2d 560, 567 (1985) (holding that, absent an agreement among the parties to the contrary, prejudgment interest should be calculated so as to avoid compounding). On the date of entry of judgment, post-judgment interest then accrues at the legally prevailing rate provided by 28 U.S.C. § 1961 until the judgment is paid in full.[6] The Court calculates prejudgment interest under the Interest Act to equal $294,363.20 and prejudgment interest under Section 2–1303 to equal $1,157.77, for a total award of $295,520.97

---

**6.** The calculation of interest in this case is best understood when viewed through the legal fiction that, by virtue of the choice of law analysis in Section II.A of this Order, this Court is sitting as an Illinois state court for purposes of calculating prejudgment interest. Therefore, had Blitz initiated this lawsuit in an Illinois state court and prevailed in the same manner, prejudgment interest would accrue at the rate of 5% per annum under the Interest Act until the date of the jury's verdict, at which time prejudgment interest would then accrue at the rate of 9% per annum under Section 2–1303's prejudgment interest provision until the date of judgment, at which time post-judgment interest would then accrue at the rate of 9% per annum under Section 2–1303's post-judgment interest provision until the judgment was paid in full. However, *Erie* requires a federal court sitting in diversity, such as this Court, to apply federal law to an award of post-judgment interest. *See Ins. Co. of N. Am. v. Lexow*, 937 F.2d 569, 572 n.4 (11th Cir. 1991). As a result, the accrual of interest under Section 2–1303 must stop upon the entry of judgment, at which time post-judgment interest accrues according to the federal post-judgment interest statute.

in prejudgment interest to Blitz, which will be included in the final judgment.[7]

## III. CONCLUSION

For the aforementioned reasons, it is **ORDERED AND ADJUDGED** as follows:

1. Plaintiff's Motion to Amend Final Judgment (Doc. 254) is **GRANTED.**

2. The Judgment dated March 11, 2016 (Doc. 238) is **VACATED.**

3. The Clerk of Court is **DIRECTED** to enter the following Amended Judgment:

Plaintiff, Blitz Telecom Consulting, LLC, shall recover from Defendant, Peerless Network, Inc., Two Million Three Hundred Forty–Seven Thousand Seven Hundred Four and 43/100 Dollars ($2,347,704.43) on Plaintiff's Complaint plus Two Hundred Ninety–Five Thousand Five Hundred Twenty and 97/100 Dollars ($295,520.97) in prejudgment interest for a total recovery of **Two Million Six Hundred Forty–Three Thousand Two Hundred Twenty–Five and 40/100 Dollars ($2,643,225.40)**, which shall bear interest at the rate of 0.66% computed daily from March 11, 2016 until the date of payment and compounded annually as required by 28 U.S.C. § 1961(b), for which sum let execution issue.

Counter–Plaintiff, Peerless Network, Inc., shall recover nothing from Counter–Defendant, Blitz Telecom Consulting, LLC, on Counter–Plaintiff's Counterclaims.

**DONE AND ORDERED** in Orlando, Florida on August 5, 2016.

## APPENDIX A

---

**7.** The Court's calculations are attached to this Order as Appendix A.

Calculation of Prejudgment Interest Under the Interest Act

| Billing Period | Commission Report Date | Payment Due Date | Amount Due | Interest Rate Per Day | Days Owed | Prejudgment Interest Due |
|---|---|---|---|---|---|---|
| 05/2012 | 07/05/2012 | 07/05/2012 | $75,587.94 | 0.0136986% | 1343 | $13,906.08 |
| 06/2012 | 08/05/2012 | 08/05/2012 | $35,473.69 | 0.0136986% | 1312 | $6,375.53 |
| 07/2012 | 09/05/2012 | 09/05/2012 | $38,233.41 | 0.0136986% | 1781 | $6,709.16 |
| 08/2012 | 10/05/2012 | 10/05/2012 | $35,419.69 | 0.0136986% | 1251 | $6,069.84 |
| 09/2012 | 11/05/2012 | 11/05/2012 | $102,531.72 | 0.0136986% | 1220 | $17,135.40 |
| 10/2012 | 12/05/2012 | 12/05/2012 | $90,598.29 | 0.0136986% | 1190 | $14,768.73 |
| 11/2012 | 01/05/2013 | 01/05/2013 | $99,213.89 | 0.0136986% | 1159 | $15,751.87 |
| 12/2012 | 02/05/2013 | 02/05/2013 | $97,929.65 | 0.0136986% | 1128 | $15,132.11 |
| 01/2013 | 03/05/2013 | 03/05/2013 | $103,041.90 | 0.0136986% | 1100 | $15,526.83 |
| 02/2013 | 04/05/2013 | 04/05/2013 | $112,435.24 | 0.0136986% | 1069 | $16,464.80 |
| 03/2013 | 05/05/2013 | 05/05/2013 | $108,865.29 | 0.0136986% | 1039 | $15,494.63 |
| 04/2013 | 06/05/2013 | 06/05/2013 | $88,631.83 | 0.0136986% | 1008 | $12,238.45 |
| 05/2013 | 07/05/2013 | 07/05/2013 | $77,695.26 | 0.0136986% | 978 | $10,409.01 |
| 06/2013 | 08/05/2013 | 08/05/2013 | $80,608.30 | 0.0136986% | 947 | $10,456.97 |
| 07/2013 | 09/05/2013 | 09/05/2013 | $70,531.38 | 0.0136986% | 916 | $8,850.22 |
| 08/2013 | 10/05/2013 | 10/05/2013 | $75,730.00 | 0.0136986% | 886 | $9,191.32 |
| 09/2013 | 11/05/2013 | 11/05/2013 | $109,212.57 | 0.0136986% | 855 | $12,791.31 |
| 10/2013 | 12/05/2013 | 12/05/2013 | $109,169.91 | 0.0136986% | 825 | $12,337.67 |
| 11/2013 | 01/05/2014 | 01/05/2014 | $121,013.98 | 0.0136986% | 794 | $13,162.31 |
| 12/2013 | 02/05/2014 | 02/05/2014 | $86,299.21 | 0.0136986% | 763 | $9,020.02 |
| 01/2014 | 03/05/2014 | 03/05/2014 | $68,101.75 | 0.0136986% | 735 | $6,856.80 |
| 02/2014 | 04/05/2014 | 04/05/2014 | $84,046.48 | 0.0136986% | 704 | $8,105.29 |
| 03/2014 | 05/05/2014 | 05/05/2014 | $67,407.67 | 0.0136986% | 674 | $6,223.65 |
| 04/2014 | 06/05/2014 | 06/05/2014 | $59,228.43 | 0.0136986% | 643 | $5,216.96 |
| 05/2014 | 07/05/2014 | 07/05/2014 | $54,313.33 | 0.0136986% | 613 | $4,560.82 |
| 06/2014 | 08/05/2014 | 08/05/2014 | $83,620.36 | 0.0136986% | 582 | $6,666.70 |
| 07/2014 | 09/05/2014 | 09/05/2014 | $69,192.84 | 0.0136986% | 551 | $5,222.63 |
| 08/2014 | 10/05/2014 | 10/05/2014 | $55,941.10 | 0.0136986% | 521 | $3,992.50 |
| 09/2014 | 11/05/2014 | 11/05/2014 | $49,575.96 | 0.0136986% | 490 | $3,327.69 |
| 10/2014 | 12/05/2014 | 12/05/2014 | $38,053.36 | 0.0136986% | 460 | $2,397.88 |

Calculation of Prejudgment Interest Under Section 2-1303

| | | 03/09/2016 | $2,347,704.43 | 0.0246575% | 2 | $1,157.77 |
|---|---|---|---|---|---|---|

TOTAL PREJUDGMENT INTEREST DUE $295,520.97